Francisco, Poncio y Julio Busó Pérez, demandantes y apelados, *v.* Monserrate Carrasquillo, y Josefa, Carmen, Angel, Roberto e Iraida Busó y Carrasquillo, y Braulio Rodríguez Pérez, éste como albacea y contador partidor, demandados y apelantes.

No. 4131.—*Visto:* Marzo 15, 1927. *Resuelto:* Diciembre 22, 1927.

1. Partición—Por Actos de las Partes — Partición de Herencia — Ataque Colateral—Causahabientes de Uno que Intervino en Ella.—Una partición de herencia hecha a base de datos suministrados por el esposo superviviente en la que éste participa, acepta y ratifica no está sujeta a ataque colateral por la esposa supérstite e hijos de un segundo matrimonio que reclamen los bienes adquiridos por él como legatario de su primera esposa cuando la escritura de partición no es nula, su validez es impugnada por vez primera después del fallecimiento del esposo y después de él haber dispuesto de dichos bienes y más de veinte años después de la fecha de tal escritura de partición.

2. Marido y Mujer—Bienes (de la Sociedad Legal de) Gananciales—Preceptos Estatutorios.—El párrafo segundo del artículo 1318 del Código Civil no se refiere a bien o derecho real actual investido en los hijos de un matrimonio anterior de acuerdo con el artículo 935 del propio Código, con anterioridad a la muerte del cónyuge supérstite que ha contraído segundas nupcias.

3. Marido y Mujer—Bienes (de la Sociedad Legal de) Gananciales—Segundo Matrimonio del Cónyuge Supérstite—Efecto—En Cuanto a los Bienes Reservables.—El cónyuge supérstite al contraer segundas nupcias no pasa a ser, con respecto a los bienes a que se refiere el artículo 935 del Código Civil, un mero usufructuario o tenedor de por vida de los mismos, y los hijos y descendientes del primer matrimonio no adquieren inmediatamente por razón de tal matrimonio un derecho real actual sobre dichos bienes.

4. MARIDO Y MUJER—BIENES (DE LA SOCIEDAD LEGAL DE) GANANCIALES—MEJORAS SOBRE BIENES PRIVATIVOS DE UN CÓNYUGE—SOBRE BIENES RESERVABLES.—Mejoras hechas sobre bienes reservables con dinero de la sociedad de gananciales del segundo matrimonio o por el trabajo o industria de cualquiera de los cónyuges no son gananciales.

5. MEJORAS—REEMBOLSO DE LAS SUMAS GASTADAS—MEJORAS SOBRE BIENES RESERVABLES.—Cuando el cónyuge supérstite que ha pasado a segundo matrimonio fallece, el título de los bienes que aquél venía obligado a reservar a los hijos o descendientes del primer matrimonio pasan inmediatamente a éstos, sujetos a la responsabilidad para el reembolso de los fondos que, pertenecientes a la sociedad ganancial posterior, se hayan utilizado o invertido en mejorar dichos bienes.

6. MARIDO Y MUJER—BIENES (DE LA SOCIEDAD LEGAL DE) GANANCIALES—MEJORAS SOBRE BIENES PRIVATIVOS DE UN CÓNYUGE—SOBRE BIENES RESERVABLES.—Cualquier duda que pueda suscitarse, debido al silencio del Código, en cuanto a la materia de mejoras cuando se hacen sobre bienes reservables con fondos de la sociedad de gananciales del segundo matrimonio, queda inmediatamente disipada por el mandato expreso del artículo 7 del Código Civil, al ordenar éste que el tribunal resuelva conforme a equidad.

7. MEJORAS—REEMBOLSO DE LAS SUMAS GASTADAS—MEJORAS SOBRE BIENES RESERVABLES.—En vista del artículo 1319 del Código Civil, no puede haber presunción legal alguna al efecto de que un cónyuge supérstite que efectúa mejoras sobre bienes reservables a expensas de los fondos pertenecientes a la sociedad de gananciales de un segundo matrimonio, lo haga con la intención de que, en caso de su fallecimiento, la esposa sobreviviente e hijos del segundo matrimonio sean privados de todo derecho a ser reembolsados por aquellos interesados en la reserva a las sumas así gastadas.

8. MEJORAS—REEMBOLSO DE LAS SUMAS GASTADAS—MEJORAS SOBRE BIENES RESERVABLES.—Cuando un cónyuge supérstite efectúa mejoras sobre bienes reservables a expensas de los fondos pertenecientes a la sociedad de gananciales de un segundo matrimonio, la esposa e hijos de este matrimonio no pueden ser privados del derecho a ser reembolsados de las sumas así gastadas por aquellos interesados en la reserva, y éstos no pueden quejarse respecto a su responsabilidad por tal reembolso.

SENTENCIA de *Gabriel Castejón*, J. (Humacao) declarando con lugar la demanda, con costas. *Revocada y confirmada* en parte y modificada y así modificada confirmada.

*González Fagundo & González, Jr.* y *Arturo Aponte,* abogados de los apelantes; *Henry G. Molina* y *Leopoldo Feliú,* abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del tribunal.

El artículo 935 del Código Civil Revisado, sección 4031 de la Compilación de los estatutos, dispone que:

"El viudo o viuda que pase a segundo matrimonio estará obli-

gado a reservar a los hijos y descendientes del primero la propiedad de todos los bienes que haya adquirido de su difunto consorte por testamento, por sucesión intestada, donación u otro cualquier título lucrativo; pero no su mitad de gananciales.''

El 27 de octubre de 1901 doña Isabel de los Santos Pérez y Sánchez otorgó su testamento en el que legó a su esposo Francisco Busó y Cabrera la tercera parte de todos sus bienes, después de deducirse todos los gastos que de los mismos deben pagarse de acuerdo con la ley. El testamento dice que la testadora nada aportó al contraer matrimonio, que el esposo había aportado una finca conocida con el nombre de ''Las Puentes,'' en el municipio de Naguabo, y que la esposa durante el matrimonio heredó de su padre don Rodulfo Pérez varias propiedades cuyo valor ascendía a la cantidad de $9,325.40, las cuales se describen más específicamente en la hijuela que se le adjudicó en una escritura de partición de fecha 25 de agosto de 1900 y que fué unida al protocolo del notario Antonio Aldrey y Montolío el 10 de septiembre del mismo año. Se designan únicos y universales herederos a cuatro menores de edad, tres de los cuales son demandantes en este caso.

La Sra. Busó falleció en octubre de 1902 y en junio de 1903, previa citación del cónyuge supérstite, se hizo una escritura de partición por un albacea designado en el testamento, sobre la base de los documentos y papeles sometidos por él, y de acuerdo con los mismos, así como con la valoración de expertos cuyo informe fué incorporado en la escritura de partición que fué aceptada, convenida y suscrita por dicho Busó Cabrera.

Francisco Busó Cabrera, en su testamento de marzo de 1925, se refiere a su primer matrimonio con Isabel de los Santos Pérez, al hecho de su fallecimiento y al de uno de los cuatro menores arriba mencionados, manifestando que había entregado a cada uno de los tres hijos restantes al llegar a su mayoridad los bienes heredados de la difunta Isabel de los Santos Pérez de acuerdo con las disposiciones

de la escritura de partición también mencionada anterior-
mente, y enumera varias partidas que se dicen ser adeudadas
por uno de los hijos.    Entonces hace constar el hecho de las
segundas nupcias que contrajo con Monserrate Carrasquillo
en septiembre de 1903 y dice que aportó a su segundo ma-
trimonio una finca nombrada "Playa," describiéndola, la
cual había sido tasada en $2,500 como su verdadero valor y
le había sido adjudicada en la división de la herencia de la
primera esposa como un legado y para el pago de bajas;
que durante su segundo matrimonio había explotado y cul-
tivado dicha finca, sembrando cocoteros en ella, aumentando
de ese modo su valor, y que tal aumento en valor forma
parte, por tanto, de la sociedad de gananciales.    Se desig-
nan entonces únicos y universales herederos a la esposa y
cinco hijos menores de edad del segundo matrimonio, aquí
demandados, juntos con los tres hijos supervivientes del
matrimonio anterior.

Los demandados apelan de una sentencia a favor de los
demandantes que los declara únicos y exclusivos dueños de
la finca en controversia desde el fallecimiento de Busó Ca-
brera en abril de 1925, y decreta que les sea reintegrada la
posesión así como ciertos cánones de arrendamiento acumu-
lados desde la fecha últimamente mencionada, además de
los intereses sobre los mismos y las costas, y ordenando a
los demandados que se abstengan de incluir dicha finca en
una proyectada división y distribución de la herencia del
referido Busó Cabrera.

[1] La primera contención de los apelantes parece ser
que, dada la confusión que surge de una asignación indis-
tinta de las varias propiedades del esposo sobreviviente en
la escritura de partición que primeramente se menciona
arriba, sin especificar en particular qué parcela de terreno
o participación en la misma sería destinada al pago de bajas
que él debía satisfacer ni lo que se intentaba adjudicar por
legado, es imposible identificar ahora las tierras en contro-
versia como de la propiedad de los demandantes o como que

pudieran revertir a ellos de acuerdo con las disposiciones del artículo 935, *supra.*

Otra indicación es que la corte inferior cometió error al no declarar que la finca "La Playa" tiene el carácter de gananciál, y, por tanto, que sólo la mitad de la misma podía ser objeto de adjudicación por vía de herencia o legado en la división y distribución de los bienes relictos de Isabel de los Santos Pérez; y un señalamiento posterior especifica además como error la conclusión a que llegó el juez sentenciador al efecto de que los demandados, en su carácter de herederos de Francisco Busó Cabrera, están impedidos de impugnar la validez de tal división y distribución. Aquí la argumentación de los apelantes va más allá de la conclusión de derecho contenida en el testamento de Francisco Busó Cabrera y busca sostén independiente en una escritura de traspaso otorgada por una hermana de Isabel de los Santos Pérez, doña María Providencia Vicenta Pérez y Sánchez, esposa de don Luis Celis Alquier, a favor de Francisco Busó Cabrera, que se suponía vender y transferir un condominio pro indiviso de la mitad de 521 cuerdas de terreno. Este documento tiene fecha de febrero 5, 1900, y especifica un precio (*consideration*) de $1,500 en efectivo que la vendedora reconoce haber recibido con anterioridad al traspaso. Expone la escritura que el condominio pro indiviso en cuestión había sido adquirido por herencia de don Rodulfo Leoncio Pérez y Polanco, padre de la vendedora, y hace mención de una escritura de partición que en aquel tiempo estaba pendiente de la aprobación de la Corte de Distrito de Humacao. El 12 de octubre de 1901 don Luis de Celis Arquier y Francisco Busó Cabrera procedieron a dividir las 521 cuerdas en dos parcelas, una de las cuales, adquiridas aparentemente de ese modo por Busó durante su matrimonio, es la que señalan ahora los apelantes como la finca en controversia. De esta escritura deducimos que Celis adquirió su condominio pro indiviso de una mitad de las 521 cuerdas por compra que hiciera de doña Isabel de los Santos Pérez,

tal como lo demuestra la escritura No. 38, otorgada el 5
de febrero de 1900 ante el notario Antonio Aldrey y Mon-
tolío, o sea, de la misma fecha que la escritura No. 39
redactada por el mismo notario, por virtud de la cual la
otra hermana, esposa de Celis, traspasó su condominio pro
indiviso en la misma propiedad a Busó Cabrera. En otra
ocasión los apelantes se quejan de un alegado error en la
admisión de la manifestación hecha por Celis como testigo
de los demandantes explicando las circunstancias que rodea-
ron el doble traspaso por las dos hermanas de sus respec-
tivos condominios pro indivisos, declaración a la cual se
opusieron los demandados por tender a variar o contradecir
los términos de un documento público.

Volviendo al orden de señalamiento de errores adoptado
en el alegato de los apelantes, una tercera proposición es que
la corte inferior erró al no considerar una defensa estable-
cida por los demandados al efecto de que en la división y
distribución de la herencia de Isabel de los Santos Pérez la
finca rústica conocida con el nombre de "Mabú" que fué
adquirida por la testadora por herencia de su padre en un
valor de $7,734.55, fué tasada por $4,500, de lo que resulta
una diferencia de $3,234.55 en perjuicio de la sociedad de
gananciales.

La escritura de partición de fecha 5 de junio de 1903 es
un documento marcadamente claro, comprensivo y ordenado.
Empieza con lo que parece ser un inventario de todos los
bienes pertenecientes a la esposa fenecida, al cónyuge su-
pérstite y a la sociedad de gananciales. Aquí se enumeran
cuatro parcelas de bienes inmuebles, varias cabezas de ga-
nado y otros bienes muebles que en resumen son los siguien-
tes:

#1. Una finca rústica llamada "Mabú," de ciento trece
cuerdas, inscrita a nombre de la finada esposa y valorada
por el tasador en $4,500;

#2. Otra finca rústica denominada "Playa," consistente
de doscientos cincuenta y tres cuerdas, inscrita a nombre de

Francisco Busó Cabrera, y valorada por el tasador en $2,500;

#3. Una casa de madera, sita en Humacao, enclavada en un solar perteneciente al municipio, inscrita a nombre de la testadora y valorada en la suma de $3,000;

#4. Otra finca rústica conocida por "Las Puentes," consistente de setecientas cincuenta cuerdas, inscrita a nombre de Busó Cabrera y tasada en $10,000;

#5. Un caballo nombrado "Tabaquillo," valorado en $75.00;

#6. Otro caballo llamado "Favorito," valorado en $50.00;

#7. Otro, "Recuerdo," valorado en $75.00;

#8. Otro, "Black," valorado en $25.00;

#9. Una yegua parida, valorada en $40.00; y

#10. Tres carros con sus enseres, por valor de $125.00. Total, $20,350.40.

Con este inventario parece que estuvieron específicamente de acuerdo todas las partes interesadas, incluso el cónyuge supérstite, Francisco Busó Cabrera, siendo aceptado y firmado separadamente por todos.

Entonces el contador designado en el testamento procede a bosquejar de una manera general la base sobre la cual se ha de hacer la propuesta división y distribución del activo. En primer término, como la piedra angular evidente de esta obra, viene una repetición detallada del contenido y disposiciones del testamento. Entonces se hace constar que de acuerdo con el inventario, los bienes inscritos como de la pertenencia de doña Isabel de los Santos Pérez ascienden a la suma de $7,500; los del cónyuge supérstite, a $10,000, y los bienes adquiridos durante el matrimonio a $2,500. Entonces se clasifica la finca "Las Puentes" como una propiedad privativa de Busó Cabrera, la cual debía adjudicársele como tal. Otra consideración preliminar es al efecto de que, toda vez que doña Isabel durante su matrimonio había heredado de su padre bienes por valor de $9,325.40 y toda vez que las parcelas que aparecen como las partidas primera y tercera en el inventario habían sido valoradas

en $7,500, se le debían adjudicar bienes suficientes de la sociedad de gananciales para cubrir esta diferencia. A esto sigue la enumeración de las deudas, obligaciones y cargos contra la sociedad de gananciales, así: Una hipoteca sobre la finca "Playa" a favor del Banco Territorial y Agrícola ascendente primeramente a $1,200 y que se dice haber sido rebajada a la suma de $600; $100 como el costo de la división y distribución de la herencia que estaba por hacerse; y $83.24 como contribución sobre herencia.

Entonces se liquida la sociedad de gananciales de este modo:

Restando del total de los bienes inventariados, $20,350.40, las deudas, obligaciones y cargos ascendentes a $783.24, queda un remanente neto de $19,567,16. El esposo aportó al matrimonio la cantidad de $10,000 y la esposa adquirió siendo casada $9,325.40, todo lo cual, restado del remanente neto últimamente mencionado, deja un balance de $241.76 como perteneciente a la sociedad de gananciales (artículo 1334 del Código Civil) para ser dividido entre el cónyuge supérstite y los herederos de doña Isabel (artículo 1377).

Para determinar el crédito del cónyuge supérstite se indica que, toda vez que la participación legal de los menores consiste en las dos terceras partes de la herencia y de la otra tercera parte tiene que salir la participación reconocídale por la ley al esposo, que es además la tercera parte que le queda disponible a la testadora, y toda vez que la testadora había legado a su esposo la tercera parte de todos sus bienes que quedaba susceptible de disposición testamentaria, el cónyuge supérstite, por tanto, aparece desempeñando un doble papel con respecto a los bienes así adquiridos por él, o sea, como un heredero forzoso y como un legatario; y por esta razón la adjudicación debe hacerse en el carácter últimamente mencionado, invistiendo de ese modo en él el dominio absoluto por virtud de tal legado. En relación con este extremo, y previendo cualquier cuestión de la necesidad futura de restar de las otras dos ter-

ceras partes de la herencia cualquier crédito que le proviniera al cónyuge supérstite de acuerdo con la ley, Busó Cabrera renunció expresamente a cualquiera reclamación o derecho y aceptó en su lugar su legado.

Fundando su acción sobre estas consideraciones preliminares, así expuestas como factores principales en la situación, el contador procede a la efectiva liquidación, división y distribución de la herencia substancialmente, y en cuanto a lo que nos interesa, como sigue:

### Cuerpo General de Bienes

Lo constituyen todos los bienes inventariados y que existan al fallecimiento de doña Isabel de los Santos Pérez y Sánchez, a saber:

#### INMUEBLES

| | |
|---|---:|
| La finca rústica inventariada con el núm. 1, en todo su valor | $4,500.00 |
| Otra finca rústica, inventariada con el núm. 2, en todo su valor | 2,500.00 |
| Una finca urbana, inventariada con el núm. 3, en todo su valor | 3,000.00 |
| Otra finca rústica, inventariada con el núm. 4, en todo su valor | 10,000.00 |
| | $20,000.00 |

#### GANADO CABALLAR

| | |
|---|---:|
| En todo el valor del ganado caballar inventariado con los números 5, 6, 7, 8 y 9 | 225.00 |

#### OTROS MUEBLES

| | |
|---|---:|
| En todo el valor de los muebles inventariados con el núm. 10 | 125.40 |
| | $20,350.40 |

#### BAJAS GENERALES

| | |
|---|---:|
| Importe de la hipoteca del Banco Territorial y Agrícola | $600.00 |
| Gastos de la partición | 100.00 |
| Pagados al Tesorero de Puerto Rico, según recibo | 83.24 |
| | $783.24 |

#### RESUMEN

| | |
|---|---:|
| Importe del capital inventariado | $20,350.40 |
| Importe de las bajas | 783.24 |
| Líquido remanente | $19,567.16 |

Importe de lo aportado al matrimonio por
Francisco Busó Cabrera_____ $10,000.00
Importe de lo adquirido por doña Isabel Pé-
rez Sánchez _____ 9,325.40
                                                    ————————— $19,325.40

Balance que representa la comunidad de ganan-
ciales_____ $241.76

### DISTRIBUCIÓN

Corresponde al viudo Francisco Busó Cabrera su mi-
tad de gananciales_____ 120.88
Corresponde a los herederos de doña Isabel de los San
tos Pérez su mitad de gananciales_____ 120.88
                                                            —————————
                                                            $241.76

### LIQUIDACIÓN

Importe del capital perteneciente à doña
Isabel de los Santos Pérez_____ $9,325.40
Por su mitad de gananciales_____ 120.88
                                                    ————————— $9,446.28
Dividida esta cantidad en tres partes, corres-
ponde a cada tercio la suma de $3,148.76.
Importa la legítima de los hijos, (artículo
796 del Código Civil), las dos terceras
partes de $9,446.28_____ 6,297.52
Cantidad que queda a la libre disposición
de la testadora _____ 3,148.76
                                                    ————————— $9,446.28
       Legítima de cada menor, $1,574.38.

### COMPROBACIÓN

Participación de Francisco Busó Cabrera_____ $14,052.88
Id. de Francisco Busó Pérez_____ 1,574.38
Id. de Poncio Busó Pérez _____ 1,574.38
Id. de Julio Busó Pérez_____ 1,574.38
Id. de Pablo Busó Pérez _____ 1,574.38
                                                                        —————————
                                                                        $20,350.40
Capital inventariado_____ $20,350.40

Entonces el contador procede a la división y distribución
de la herencia, adjudicándole al cónyuge supérstite bienes
por valor de las deudas, obligaciones y cargos existentes
contra la herencia, e imponiéndole la obligación de saldar

tales bajas. La hijuela adjudicada a Busó Cabrera fué formulada y constituída como sigue:

Ha de haber este interesado:
Por su aportación matrimonial_____ $10, 000. 00
Por su mitad de gananciales_____       120. 88
Para el pago de bajas_____       783. 24
Cantidad del legado_____     3, 148. 76
                                                            —————— $14, 052. 88

ADJUDICACIONES
El pleno dominio de la finca rústica "Las
   Puentes," núm. 4 del inventario_____ $10, 000. 00
El total de la finca "La Playa," núm. 2
   del inventario, valorada en_____   2, 500. 00
$1,425.62 en el valor de $3,000.00 en que
   está valorada en el inventario una finca
   urbana_____   1, 425. 62
Un crédito de $1.86 en contra de los here-
   deros Francisco, Poncio y Julio, a razón
   de 62 cts. cada uno_____          1. 86
Los muebles inventariados con el núm. 10__     125. 40
                                                            —————— $14, 052. 88

Para probar la valoración fijada sobre la finca "Mabú" al tiempo de ser adquirida por doña Isabel de los Santos Pérez, los demandados presentaron como prueba una porción o fragmento de la escritura de partición de fecha 25 de agosto de 1900, mencionada por doña Isabel en su testamento. Este documento no demuestra ser la escritura original de partición sino que es una división y distribución posterior entre las partes interesadas de ciertos condominios pro indivisos adjudicados en tal escritura original. Al final del juicio los abogados de los demandantes solicitaron tiempo para presentar una copia certificada de este original, y los abogados de los demandados inmediatamente admitieron que del escrito, de haber sido presentado, habría aparecido que los dos condominios pro indivisos de por mitad de que dispusieron simultáneamente doña Isabel y doña Providencia Pérez con fecha 5 de febrero de 1900 fueron adquiridos por ellas por herencia de su padre don Rodulfo Leoncio Pérez.

No se mencionan en el escrito del 25 de agosto de 1900 ni las 521 cuerdas ni el condominio pro indiviso de por mitad

sobre las mismas adquirido por doña Isabel de los Santos
Pérez al tiempo de la partición original, y, en ausencia. de
cualquier explicación en alguna otra parte de los autos, el
doble traspaso anterior de fecha 5 de febrero puede muy
bien considerarse como la razón más obvia para esta omisión
que de otro modo hubiera sido curiosa.  Por otra parte, en
adición a la finca ''Mabú,'' valorada en \$7,734.55, y con el
fin de completar los \$9,325.40 mencionados en el testamento
de doña Isabel de los Santos Pérez así como a través de la
escritura de partición basada posteriormente en el mismo,
hallamos una adjudicación de caña de azúcar en estado de
crecimiento por valor de \$1,197.10, otra en efectivo por la
cantidad de \$143.75, otra consistente en un condominio pro
indiviso en un molino de arroz tasado en \$50, y otra consis-
tente de cuatro carros designados con sus partes y enseres
adicionales valorados en \$200.

Antes de su fallecimiento, doña Isabel había segregado
de la finca ''Mabú'' y vendido al municipio de Humacao una
parcela de cinco cuerdas, y Busó Cabrera fué autorizado en
la escritura de partición de la herencia de la esposa fenecida
para otorgar una escritura a favor del municipio, pero no
se especifica ni se rinde cuenta del producido de esta venta.

Desde luego, puede ser que todas estas partidas fueran
incluídas de uno u otro modo en la casa de madera, el ganado
caballar y otros bienes muebles enumerados en el inventario
y que no fueron clasificados específicamente por el contador
como pertenecientes a la sociedad de gananciales ni pre-
tenden los demandantes así clasificarlos.  Pero ésta no es la
cuestión.  El punto es que si al tiempo de hacerse la parti-
ción el cónyuge supérstite hubiera levantado cualquiera de
las cuestiones que ahora tratan de levantar los demandados
por primera vez, fácilmente habríase podido comprobar los
hechos y hacerle inmediata justicia substancial a todas las
partes interesadas.

Si Busó Cabrera hubiese llamado la atención hacia el
hecho de que su participación en los bienes de la sociedad

de gananciales iba a ser perjudicada por el método pro-
puesto para.la liquidación del activo de la comunidad, enton-
ces los representantes legales de los menores, así como los
tres jueces de distrito que más tarde aprobaron la división
y distribución tal como se hizo, habrían tenido una oportu-
nidad para poner en duda la valoración más reciente de la
finca "Mabú" y de exigir alguna explicación satisfactoria
sobre la discrepancia extraordinaria que existía entre las
.dos tasaciones. Habiendo llegado tan recientemente a la
posesión de la finada esposa las otras partidas de bienes pri-
vativos que arriba se mencionan, fácilmente se les hubiera
podido seguir la huella, identificarlas y darse razón de ellas.
El verdadero carácter de la finca "La Playa" como de la
propiedad separada de la testadora pudo haber sido esta-
blecido de una vez, caso en el cual aparentemente no hubiera
habido duda alguna en cuanto a la existencia de un bien
ganancial o de algún interés en la misma de parte del cón-
yuge superviviente. Y si Busó Cabrera hubiese insistido en
la condición *prima facie* de ganancial de la finca "La Playa,"
entonces los herederos, con igual o aún mayor plausibilidad
habrían invocado una presunción similar *juris tantum* con
respecto a la finca "Las Puentes."

En realidad, cuando uno de los hijos mayores del primer
matrimonio había llegado a su mayoridad y se entabló un
pleito para recobrar un condominio pro indiviso de la mitad
de la finca "Las Puentes," que mientras tanto había pasado
a otras manos, Busó Cabrera negó en su contestación que
hubiera adquirido la finca "Las Puentes" durante su ma-
trimonio anterior por compra que hiciera con dinero perte-
neciente a la sociedad de gananciales, a don Francisco Busó
Baster, y como defensa afirmativa alegó la manifestación o
admisión contenida en el testamento de su primera esposa,
y alegó que la escritura descrita en la demanda era un
mero antifaz o plan artificial que pretendía investir en Busó
por medio de venta un título que en verdad había adquirido
por herencia de su madre, y que se había recurrido a esa

venta simulada con el objeto de evitar los gastos y complicaciones de un procedimiento de testamentaría. Aunque este pleito fué transigido posteriormente y se pagaron unos $2,000 en saldo del mismo por el demandado, quien estaba entonces en la posesión material de la finca ''Las Puentes,'' Busó Cabrera no impugnó la validez o regularidad de la división y distribución de la herencia de doña Isabel Pérez, que los aquí demandados ahora critican y ponen en tela de juicio, pero que no atacan directamente.

La inscripción cuarta del Registro de la Propiedad, referente a la finca ''La Playa,'' revela los hechos salientes del último testamento de doña Isabel de los Santos Pérez, incluyendo el legado a su esposo, indica que esta finca, encontrándose entre el activo de la testadora, había sido adjudicada a su esposo superviviente en pago de obligaciones contraídas por él ''para pago de bajas'' y como parte de su legado, y nos demuestra que, por virtud de esos acontecimientos, Francisco Busó Cabrera inscribió la finca a su nombre como que había sido adquirida por legado testamentario ''y para pago de bajas.'' Como ya hemos indicado, el testamento de don Francisco Busó Cabrera, otorgado más de dos décadas después de esta inscripción, procede bajo la misma teoría en cuanto al origen y naturaleza del título.

Por lo menos teóricamente se segregó y separó del cuerpo general de bienes una cantidad suficiente para satisfacer los créditos pendientes de pago por la herencia antes de procederse a la división y distribución de los mismos. No es sino después que se le impone al cónyuge supérstite y que éste asume, la obligación de saldar todas estas deudas pendientes, que se le adjudican por vía de reembolso, bienes por valor de tal obligación en adición a los que recibió como legatario, como miembro sobreviviente de la sociedad de gananciales o como dueño privativo. En el pleito sobre ''Las Puentes,'' *supra,* Busó admitió que esta finca le había sido asignada como su propiedad privativa. Es evidente que más de las tres cuartas partes de todos los otros bienes adjudi-

cados a Busó las había recibido como legado. El mero hecho de que el partidor o el notario dejaran de prever y anticipar la posibilidad de que los bienes así adquiridos por Busó como legatario llegaran a ser reservables en el caso de un segundo matrimonio, no puede frustrar el cumplimiento del artículo 935 del Código Civil.

Para los fines de esta opinión podemos admitir que Busó, aún después de la venta de "Las Puentes," y mientras estuvo en posesión del resto de los bienes antes mencionados, estaba en libertad de decir lo que debía considerarse como reservable y lo que él aceptaría como su participación en la sociedad de gananciales o como compensación de la obligación asumida por él con respecto a las deudas pendientes contra la herencia. Pero no deseamos asumir, como lo hacen los apelantes, que después que se dispusiera de bienes más que suficientes para cubrir tanto la cantidad de las deudas pendientes como el valor estimado de la participación de Busó en los bienes gananciales, se le hubiera permitido impugnar la naturaleza de la única parcela de terreno restante como un legado de acuerdo con el testamento, no obstante el hecho de que tal parcela sólo representaba una porción fraccionaria del legado.

El artículo 1043 del Código Civil dispone que:

"La acción rescisoria por causa de *lesión* durará cuatro años, contados desde que se hizo la partición."

No podemos concurrir con el criterio de que una división y distribución de la herencia de una esposa fallecida, que se hace a base de datos suministrados por el esposo sobreviviente, y en la cual participó aceptó y ratificó, esté sujeta a ataque colateral por la esposa supérstite y los hijos de un segundo matrimonio que reclamen, como herederos y legatarios del referido esposo, los bienes adquiridos por él como legatario bajo el testamento de la primera esposa, cuando aparece que la escritura de partición de referencia era a lo sumo anulable, pero no nula, y su validez es impugnada por

primera vez después del fallecimento del esposo, mucho después de haber dispuesto él del total de los bienes recibidos por él como tal legatario o partícipe en la distribución, y más de veinte años después de la fecha de tal división y distribución.

[2, 3] Una cuestión algo más seria está envuelta en el cuarto señalamiento en que descansan los apelantes, al efecto de que la corte inferior erró al no declarar que el aumento en valor de la finca ''Playa'' debido a mejoras introducidas en la misma con dinero perteneciente a la sociedad de gananciales posterior y gastado en drenaje y siembra de cocoteros, pertenecía a la sociedad de gananciales del segundo matrimonio.

Los artículos 1318 y 1319 del Código Civil dicen así:

''Artículo 1318.  El derecho de usufructo o de pensión, perteneciente a uno de los cónyuges perpetuamente o de por vida, formará parte de sus bienes propios; pero los frutos, pensiones e intereses devengados durante el matrimonio, serán gananciales.

''Se comprende en esta disposición el usufructo que tienen los cónyuges en los bienes de sus hijos, aunque sean de otro matrimonio.

''Artículo 1319.  Las expensas útiles, hechas con los bienes peculiares de cualquiera de los cónyuges mediante anticipaciones de la sociedad o por la industria del marido o de la mujer, son gananciales.

''Lo serán también los edificios construídos durante el matrimonio en suelo propio de uno de los cónyuges, abonándose el valor del suelo al cónyuge a quien pertenezca.''

Nos inclinamos a convenir con los abogados de los apelados en que el segundo párrafo del artículo 1318 no se refiere a bien o derecho real actual investido en los hijos de un matrimonio anterior de acuerdo con los términos del artículo 935, *supra,* con anterioridad a la muerte del cónyuge supérstite que ha contraído segundas nupcias.  Admitiendo para los fines de la argumentación, sin que lo resolvamos, que el cónyuge superviviente del primer matrimonio al volverse a casar pasa a ser un mero tenedor de por vida de los bienes reservables a que hace referencia el artículo

935, entonces el carácter de su herencia sobre la propiedad como un usufructo de por vida, dentro del significado del primer párrafo del artículo 1318, es demasiado claro para necesitar argumentación. No necesitamos extendernos, por tanto, en esta ocasión en cuanto al propósito y alcance del segundo párrafo del artículo últimamente mencionado.

Pero sea ello como fuere, estamos obligados a decidir que el cónyuge supérstite no es un mero usufructuario o tenedor de por vida. Los bienes mencionados en el artículo 935 no son de la propiedad de los hijos y descendientes del matrimonio anterior. Son bienes cuyo título legal ha sido investido ya en el cónyuge supérstite. La obligación de reservar o separar la posesión sólo surge en el caso de un segundo matrimonio. Ni tampoco el cónyuge supérstite es despojado de su título por virtud de tal matrimonio posterior.

El artículo 937 dispone, entre otras cosas, que—

"Cesará la obligación de reservar cuando los hijos de un matrimonio, mayores de edad, que tengan derecho a los bienes, renuncien expresamente a él . . ."

Evidentemente, la ley habla aquí de un derecho y de una renuncia al mismo, no de un interés reversible investido y un traspaso de tal interés en las tierras.

El artículo 938 expresamente ordena que—

"Cesará además la reserva si al morir el padre o la madre que contrajo segundo matrimonio no existen hijos ni descendientes legítimos del primero."

De modo que aparece que la reserva puede o no convertirse en una reversión y que el título legal permanece en la viuda o viudo del primer matrimonio, sujeto a una contingencia futura o condición posterior que puede que nunca ocurran.

Las palabras *reserva, reservar* y *bienes reservables* están claramente definidas por Morell en 4 Legislación Hipotecaria 367.

Los artículos 939 a 945, inclusive, leen como sigue:

"Artículo 939. A pesar de la obligación de reservar, podrá el padre, o madre, segunda vez casado, mejorar en los bienes reservables a cualquiera de los hijos o descendientes del primer matrimonio.

"Artículo 940. Si el padre o la madre no hubiere usado, en todo o en parte, de la facultad que le concede el artículo anterior, los hijos y descendientes legítimos del primer matrimonio sucederán en los bienes sujetos a reserva conforme a las reglas prescritas para la sucesión en línea descendente, aunque a virtud de testamento hubiesen heredado desigualmente al cónyuge premuerto, o hubiesen renunciado o repudiado su herencia.

"El hijo desheredado justamente por el padre o por la madre, perderá todo derecho a la reserva.

"Artículo 941. Serán válidas las enajenaciones de los bienes inmuebles reservables hechas por el cónyuge sobreviviente antes de celebrar segundas bodas, con la obligación desde que las celebrare, de asegurar el valor de aquéllos a los hijos y descendientes del primer matrimonio.

"Artículo 942. La enajenación que de los bienes inmuebles sujetos a reserva hubiere hecho el viudo o la viuda después de contraer segundo matrimonio, subsistirá únicamente si a su muerte no quedan hijos ni descendientes legítimos del primero; sin perjuicio de lo dispuesto en la Ley Hipotecaria.

"Artículo 943. Las enajenaciones de los bienes muebles hechas antes o después de contraer segundo matrimonio, serán válidas, salva siempre la obligación de indemnizar.

"Artículo 944. El viudo o la viuda, al repetir matrimonio, hará inventariar todos los bienes sujetos a reserva. anotar en el registro de la propiedad la calidad de reservables de los inmuebles con arreglo a lo dispuesto en la Ley Hipotecaria, y tasar los muebles.

"Artículo 945. Estará además obligado el viudo o viuda, al repetir matrimonio, a asegurar con hipoteca:

"1. El abono de los deterioros ocasionados o que se ocasionaren por su culpa o negligencia.

"2. La devolución del precio que hubiese recibido por los bienes muebles enajenados o la entrega del valor que tenían al tiempo de la enajenación si ésta se hubiese hecho a título gratuito.

"3. El valor de los bienes inmuebles válidamente enajenados.'"

Después de considerar cuidadosamente la cuestión, Manresa llega a la conclusión de que no hay base satisfactoria en el código para la teoría de que el cónyuge supérstite al contraer segundas nupcias pasa a ser un mero usufructuario y que los hijos y descendientes del matrimonio anterior inmediatamente adquieren un derecho real actual sobre los bienes (7 Comentarios al Código Civil, 2da. ed., pág. 246), que el derecho del cónyuge supérstite mientras continúa en la posesión de los bienes reservables, es un derecho condicional que puede convertirse en absoluto y puede aún más fácilmente desaparecer; y que en caso de que sobrevivan los hijos o descendientes del primer matrimonio, hecho incierto y futuro, su derecho se extingue (*id.* pág. 249); o, como se expresa ese mismo criterio en la página 251 del tomo últimamente mencionado:

"En todo el período que media desde el nacimiento de la reserva hasta su extinción, los hijos o descendientes, una vez asegurado el derecho que en su día les puede corresponder, sólo tienen una esperanza, y por tanto, no tienen ni aún la facultad de transmitir esa esperanza a sus herederos.

"El viudo es en primer término un usufructuario, que deberá usar o disfrutar las cosas según su naturaleza, en el modo y forma expresados al tratar del usufructo. Pero como además de ser usufructuario, es, aunque condicionalmente, nudo propietario de los bienes, puede disponer de ellos, del modo establecido en los artículos 974 al 976."

Morell es aún más específico:

"El derecho del viudo se halla afecto a una condición resolutoria; el derecho de los hijos se halla afecto a una condición suspensiva." 4 Legislación Hipotecaria, Morell, pág. 374.

El artículo 935 del Código Civil Revisado, tal como fué adoptado por nuestra Legislatura Insular en 1902, empezaba con las palabras "Además de la reserva impuesta en el artículo 799," y el artículo últimamente mencionado, que fué derogado posteriormente por la ley de 8 de marzo de

1906, Leyes de ese año, página 24, hasta la fecha de tal derogación estaba redactado en los siguientes términos:

"Art. 799.—El ascendiente que heredare de su descendiente bienes que éste hubiere adquirido por título lucrativo de otro ascendiente, o de un hermano, se halla obligado a reservar los que hubiere adquirido por ministerio de la ley en favor de los parientes que estén dentro del tercer grado y pertenezcan a la línea de donde los bienes proceden."

Los artículos correspondientes, 968 y 811 del Código Civil español, han sido interpretados estrictamente tanto por las cortes como por los comentaristas, como una limitación al libre ejercicio de los derechos incidentales al dominio, y Morell es claramente de opinión que el artículo 811 del código español debe ser derogado. 4 Legislación Hipotecaria, págs. 381, 389 y 390.

[4, 5] En el caso de *Edroso* v. *Sablan,* 25 Jurisprudencia Filipina 306, la primera cuestión levantada por el alegato del apelante fué "Cuáles sean los derechos del reservista en los bienes reservables del artículo 811 del Código Civil." Y la contestación puede hallarse en la hábil exposición hecha por la Corte Suprema de Filipinas por voz del Juez Presidente Arellano, y que comienza en la página 317 del tomo antes citado.

No hay conflicto alguno entre los artículos 935 y el párrafo primero del artículo 1319 a menos que una inteligente aplicación de la regla sentada en el párrafo últimamente mencionado menoscabe el interés reversible o de otro modo perjudique el derecho estatutorio de aquellos a cuyo favor existe la reserva (*reservees*) mencionados en el artículo 935. El primer párrafo del artículo 1319 no dice que las mejoras hechas con dinero perteneciente a la sociedad de gananciales o por el trabajo o industria de cualquiera de los cónyuges son gananciales. Y mucho menos trata de investir en la sociedad de gananciales cualquier interés legal en la finca en la cual se han efectuado tales mejoras. El único privilegio conferídole a la sociedad es un derecho al

reembolso que a lo sumo asciende en tanto en cuanto se refiere a los bienes en los cuales se hacen las mejoras, a un derecho equitativo o carga o gravamen sobre los bienes. El modo de averiguar el grado de utilidad de las mejoras hechas o el valor del tiempo y la labor invertidos por cualquiera dé los cónyuges en las mismas, o el total del dinero invertido, perteneciente a la sociedad de gananciales, con el fin de determinar la cantidad a que tiene derecho la sociedad de gananciales por vía de compensación o reembolso, es otra cuestión. La conclusión a que llega Manresa sobre este aspecto de la cuestión está expuesta en el tomo 9 de sus Comentarios al Código Civil, 2da. ed., págs. 600 y 601.

Prácticamente la misma regla parece prevalecer en Louisiana y Texas. Así, en el caso de *Babin* v. *Nolan,* 6 Rob. (La.) 508, 514, la Corte Suprema de Louisiana dijo:

"Es claro que el informe de los peritos y la sentencia apelada se basan sobre la valoración de la propiedad de acuerdo con su precio al tiempo de contraerse matrimonio; y que se determinó el aumento en dicha propiedad no por la diferencia entre el valor de la tierra por sí sola al tiempo de la disolución de la sociedad, y su valor real con todas las mejoras existentes en ella en el mismo período, sino por la diferencia entre el valor al tiempo del matrimonio y su valoración en el momento en que actuaron los peritos. Esto es incorrecto, ya que es obvio que este método necesariamente tendría que incluir entre las mejoras cualquier aumento en valor derivado del curso ordinario de las cosas, la subida en el precio de la finca, o los albures del mercado. No podemos concebir qué dificultad pudo haber hallado la corte inferior al seguir el curso indicado por nuestra sentencia anterior. Es muy sencillo, limitándose a las siguientes preguntas, para ser contestadas por los peritos o por la evidencia aducida por las partes:

"Primera. ¿Cuál era el estado de la finca al tiempo del matrimonio?

"Segunda. Al disolverse la sociedad, ¿cuál sería el valor de la finca en el estado en que se hallaba al tiempo del matrimonio?

"Tercera. ¿Cuál era el valor real de la referida propiedad con todas las mejoras existentes en la misma, en el estado en que se encontraba al disolverse la sociedad?

"Cuarta.   ¿Cuál es la diferencia entre los dos cálculos?

En el caso de *Rice* v. *Rice*, 21 Texas Rep. 58, 66, la Corte Suprema, por voz de su Juez Presidente Sr. Hemphill, se expresó así:

"Pero el veredicto en tanto en cuanto declara que las mejoras sobre los solares pertenecen a la sociedad de gananciales, sólo es correcto en un sentido modificado. Son aditamentos, adheridos al suelo, y, por la naturaleza de las cosas, no pueden legarse en especie, cuando uno de los condueños no tiene participación en las tierras en que se han enclavado. Y de aquí surge la regla de que debe reembolsársele al caudal común el costo de los edificios construídos por la industria o con los fondos de ambos cónyuges, sobre los bienes privativos de uno de ellos; y, en efecto, estas mejoras pasan a poder de ese cónyuge y le dan derecho al otro a la mitad del costo. Esta era la regla positiva bajo el código español; y las circunstancias y estado de estos bienes son tales que sólo pueden legarse en metálico y no por su clase. Schmidt, Leyes de España y México, p. 13; 1 White, p. 62. El veredicto del jurado al efecto de que las mejoras pertenecen a la sociedad, no necesita ser alterado; y de creerse conveniente, pueden llevarse a cabo nuevos procedimientos para determinar el costo de los edificios."

En el caso de *Bond* v. *Hill*, 37 Texas Rep. 626, se dice lo siguiente:

"S. murió intestado, dejando una esposa y varios hijos. Al repartirse la herencia entre su viuda e hijos, se le asignó a aquélla, entre otras cosas, un dominio vitalicio sobre la finca constitutiva del hogar seguro (*homestead property*) la cual, según parece, era bien privativo del esposo fallecido. Posteriormente, ella se casó con el apelante, quien se mudó a la finca y por algún tiempo la ocupó como su hogar seguro, efectuando en ella valiosas mejoras."

La Corte Suprema revocó la sentencia apelada y resolvió la cuestión legal técnica que estaba envuelta, resumidamente como sigue:

"Durante el tiempo que la finca estuvo así ocupada, Bond introdujo valiosas mejoras en ella. y ahora que la Sra. Bond ha dejado de existir, y que los herederos de Silvey están litigando por la propiedad, y de acuerdo con la ley aparecen tener derecho a la

misma, la cuestión que se nos presenta a nuestra consideración es, ¿deberán los demandados en el recurso de error obtener la finca, libre de todo gravamen por las mejoras?

"Bajo el estado algo indeterminado de muchas cuestiones que surgen del derecho al hogar seguro (y, en verdad, estas cuestiones parece que se multiplican ante las cortes y a menudo son de muy difícil solución), Bond pudo haber considerado el derecho al hogar seguro de su esposa como que había pasado a él, y en verdad, la finca, *sub modo,* como de su pertenencia; y no podemos considerarlo como un usufructuario ordinario de determinada herencia, que efectúa mejoras para gravar la heredad de la persona con derecho al remanente (*remainderman*).

"En el caso de Dorn v. Dunham, 24 Tex. 366, esta corte fijó el derecho de recobrar por las mejoras hechas por el usufructuario vitalicio de la propiedad fundándose en que habían sido efectuadas de buena fe y en que no dependía de la cuestión de título; y creemos que ésta ha sido la decisión uniforme de esta corte.

"Los principios de derecho y equidad están tan fundidos en nuestro sistema que a veces les es difícil a las cortes llegar a la resolución correcta de las causas, y sin embargo, a las cortes se les permite una mayor latitud que en aquellos sitios en que los dos sistemas se conservan separados. La regla rígida del derecho común de que un usufructuario de por vida no puede gravar la propiedad de las personas con derecho al remanente (*remainderman*) por las mejoras, creemos que sería injusta para con él, de ser éste un caso en que tal regla deba ser aplicada. Indudablemente, la finca adquiere más valor para los herederos de James E. Silvey, del que tendría sin las mejoras, y, ¿qué derecho tienen ellos en conciencia para pedir que su padrastro pierda el dinero que ha invertido para beneficio de ellos? Puede que sea cierto que estas mejoras fueran hechas durante la minoridad de los apelados y que éstos no intervinieron en ellas. Pero quizá pueda decirse algo en cuanto al extremo opuesto. ¿Comparecieron ellos ante una corte de equidad? Porque aparecería, de la evidencia en este caso, que el apelante, durante una parte de la minoridad de los apelados, se mantuvo en el sitio de un padre bondadoso e indulgente, haciendo por ellos lo que a su juicio más maduro consideraba justo y correcto.

"Claramente somos de opinión que Bond, el demandante en el recurso de error, ha actuado de buena fe y que tiene derecho, bajo todo justo principio de ley y equidad, a una compensación razonable por sus mejoras."

Es bueno añadir, sin embargo, que la misma corte en el caso de *Clift* v. *Clift*, 72 Tex. 144, intenta trazar una línea divisoria entre la responsabilidad de la persona con derecho al remanente, cuyos intereses podrían ser perjudicados si se le exigiera que reembolse a los herederos de un mero tenedor vitalicio el importe de las mejoras hechas por él y entre la de un condueño que nada pierde por razón de un reembolso similar de parte de los herederos de sus co-tenedores que ha hecho mejoras en la propiedad poseída en común.   Sobre el punto últimamente mencionado, la opinión prosigue así (bastardillas nuestras):

"Pero ¿tiene el segundo caudal común al efectuarse la partición derecho al reembolso del dinero así invertido? En cuanto a la faja de terreno que está ahora bajo nuestra consideración, Stephen A. Clift, padre del apelante, ocupa una posición distinta a la ocupada por él en cuanto al remanente del terreno sobre el cual está enclavado el edificio. El era un poseedor en común con los hijos de su esposa de esta faja de terreno, poseyendo un condominio pro indiviso de la mitad por un título de dominio absoluto. Esta propiedad pertenecía en común a él y a su primera esposa, y él era el cónyuge supérstite.

"Puede admitirse que como un mero poseedor en común él nada podía reclamar por las mejoras a menos que se le pudieran separar, dejando la mitad en el valor de las tierras no mejoradas a los hijos de la primera esposa; pero podemos decir, en cuanto a este pequeño pedazo de terreno, que no era susceptible de partición. Las partes, aún durante la vida del padre, sólo hubieran podido obtener su participación por medio de una venta. Por lo tanto, haciéndose necesaria una venta para la disgregación de sus participaciones no vemos razón por la cual las partes que hubieran tenido derecho a la propiedad y los fondos que se pagaron por la casa, no debieron haber separado para sí, del producto de la venta, la cantidad en que fué aumentado el valor de la casa debido a tales mejoras. Como los apelados pueden asegurar sus derechos en equidad sin privar a los apelantes de algún derecho que podrían tener si no se hubiera hecho mejora alguna, no vemos razón por la cual esto no pueda hacerse. Además, somos de opinión que *en el ajuste de los derechos en equidad que emergen de las reclamaciones en conflictos que surgen bajo nuestras leyes sobre la sociedad de ganan-*

*ciales, no debemos ser restringidos por las reglas rígidas que se*
*aplican ordinariamente entre los poseedores en común.* Véase *Rice*
v. *Rice,* 21 Tex. 66; *Furrh* v. *Winston,* 66 Tex. 521.''

La regla antigua de que si un usufructuario de por vida
efectúa mejoras permanentes para la comodidad y conve-
niencia de él y su familia se presumirá que fueron hechas
para su propio beneficio y nada puede recobrar de la per-
sona con derecho al remanente (*remainderman*) o a la rever-
sión (*reversioner*), no deja de tener sus excepciones y ha
sido algo relajada por decisiones posteriores en muchos
casos, como por ejemplo, ''cuando las mejoras son necesarias
con motivo de condiciones variadas o para obtener un bene-
ficio razonable de la propiedad improductiva, y los gastos
de tales mejoras son para mayor beneficio tanto de la persona
con derecho al remanente como del usufructuario de por vida,
y no contraviene los términos de un documento creando el
interés de por vida y el interés en el remanente. . .'' 21
C. J. 953.

Con relación a esto es interesante notar los prototipos
de los dos párrafos del artículo 1404 del código español,
correspondientes al artículo 1319 del nuestro, tal como indica
Manresa en el tomo 9 de sus Comentarios al Código Civil,
página 597, y que se omiten aquí para mayor brevedad.

El párrafo primero del artículo 1319 es el que prescribe
la regla general. El segundo párrafo de ese artículo esta-
blece una excepción a la regla general y revoca el principio
fundamental de que lo accesorio sigue a lo principal hasta
**el límite, y sólo hasta el límite,** de la excepción así estable-
cida. El mero hecho de que la regla sentada para gobernar
el caso excepcional de un edificio subvierte el principio que
regula la aplicación de la más amplia disposición estatu-
toria del primer párrafo, no hace que tal principio y dis-
posición sean inconsistentes o incompatibles con los derechos
conferidos por el artículo 935 a los hijos o descendientes de
un matrimonio anterior. Véase con respecto a este extremo
el tomo 9 de los Comentarios al Código Civil por Manresa,

página 601, en que se cita a Goyena con aprobación en cuanto
a la teoría de esta excepción a la regla general.

El fin obvio del artículo 935 primeramente mencionado
es proteger a los hijos y descendientes de un matrimonio
anterior de los desastrosos resultados que surgirían con
motivo de un cambio en el afecto y la actitud paternal, que
según lo ha demostrado la experiencia humana, frecuente-
mente sigue al séquito de una aventura matrimonial pos-
terior.   7 Manresa, Comentario al Código Civil, 2da. edición,
página 192.

En realidad el cónyuge supérstite que desee favorecer
la progenie de una unión posterior a expensas de los hijos
o descendientes de un matrimonio anterior, no estaría incli-
nado a invertir fondos del caudal común en mejoras per-
manentes sobre bienes reservables improductivos, en vista
de una interpretación judicial del artículo 1319, que excluye
tal inversión de ese precepto estatutorio, y con preferencia
a una transacción igualmente provechosa y menos arriesgada
desde el punto de vista de la nueva sociedad de gananciales.
De aquí que el mismo pensamiento que de acuerdo con
Goyena indujo a los que redactaron el código a establecer
la excepción a la regla general en el caso de edificios erigidos
con fondos de la sociedad de gananciales, debería impulsar-
nos *a fortiori* a resolver que los artículos 935 y 1319 pueden
subsistir juntos. *Ubi eadem ratio, eadem legis dispositio.*
En relación con esto puede notarse de paso que sólo el
edificio y el terreno sobre el cual está enclavado necesitarían
ser incluídos en el procedimiento de partición de los bienes
relictos al fallecimiento del dueño de los bienes reservables.
Si los hijos o descendientes del matrimonio anterior, o cual-
quiera de ellos, probaren ser menores al tiempo de tal
partición, el documento necesariamente tendría que ser some-
tido a la corte de distrito competente para su aprobación, y
de todos modos puede dependerse de las cortes, que siempre
están dispuestas a hacer justicia, para ver que las personas
con derecho a la reserva (*reservees*) sean bien compensadas

monetariamente o con bienes de cualquier otra clase por la pérdida de aquella porción de la propiedad reservable que hubiera sido utilizada como solar del edificio.  Pero, sea esto como fuere, y como hemos ya indicado, no necesitamos vacilar en aplicar la regla general a causa de cualquier duda conjetural en cuanto a si la excepción estatutoria de esa regla es o no igualmente aplicable, y la cuestión en cuanto al curso adecuado a seguir en el caso excepcional especificado en el segundo párrafo del artículo 1319 puede muy bien dejarse abierta para una consideración ulterior cuando se haga necesaria su determinación final.

El artículo 935 no hace mención de las mejoras.  En ninguno de los trece artículos que tienden a cubrir toda la materia sobre bienes reservables se mencionan las mejoras. Mucho menos han sido tales bienes excluídos de los efectos de la regla general prescrita por el artículo 1319.  Como hemos dicho ya, estos trece artículos han sido estrictamente interpretados del mismo modo en todas las ocasiones por las cortes y los comentaristas.

El artículo 1319 habla de "los bienes peculiares de cualquiera de los cónyuges."  No crea exención alguna a favor de los bienes reservables, o de las personas con derecho a la reserva mencionada en el artículo 935, o en cualquier otro sitio.  El lenguaje del artículo 1318 es perfectamente claro.  Repitiendo: "El derecho de usufructo o de pensión, perteneciente a uno de los cónyuges perpetuamente o de por vida, formará parte de sus bienes propios. . ."  Aún si el poseedor vitalicio de los bienes reservables no fuera nada más que un poseedor de por vida o usufructuario, la cuestión que está ahora bajo consideración podría tratarse como un caso de *lex scripta*.  Pero como hemos demostrado, además, tal usufructuario, aunque indudablemente es un poseedor de por vida, es de igual modo el dueño del título legal, sujeto solamente a una condición posterior o a una contingencia que puede o no convertirse en una reversión.

[6] Sin embargo, no necesitamos basar nuestra decisión

enteramente en la letra del estatuto, que dispone el reembolso a la sociedad de gananciales. Cualquier duda que pueda suscitarse debido al silencio del código en cuanto a la materia de mejoras cuando se hacen sobre bienes reservables, con fondos de la sociedad de gananciales del segundo matrimonio, queda inmediatamente disipada por el mandato expreso del artículo 7 del Código Civil, que lee como sigue:

"El tribunal que rehuse fallar a pretexto de silencio, obscuridad o insuficiencia de la ley, o por cualquier otro motivo, incurrirá en responsabilidad.

"Cuando no haya ley aplicable al caso, el tribunal resolverá conforme a equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho y los usos y costumbres aceptados y establecidos."

[7] Es bueno tener en mente que el cónyuge supérstite que contrae segundas nupcias no siempre experimenta necesariamente un cambio de corazón y de actitud mental hacia los hijos de la unión anterior. Los que redactaron el artículo 935 no intentaron proveer un pretexto mediante el cual el esposo en el segundo matrimonio, al deshacerse de la segunda esposa y sus hijos, pudiera robarles alguna parte de sus participaciones en el caudal común. Si en el presente caso hubiese dejado de existir la segunda esposa, en vez del esposo, difícilmente se le hubiera permitido a Busó protestar de que se le cargara la cantidad de los fondos pertenecientes a la sociedad de gananciales que gastó en la finca "Playa" como dueño de ella, o, en caso de que hubiera dificultad al determinarse la cantidad de dinero así invertida o el valor de su tiempo e industria, así como el aumento en valor de tal finca con motivo del dinero, tiempo e industria así invertidos en ella. Tampoco concebimos cómo la muerte de Busó, bien precediera o siguiera a la de la segunda esposa, puede surtir efecto en el sentido de despojar a la esposa y los hijos del segundo matrimonio del derecho expresamente conferídoles por los términos del artículo 1319.

Desde luego es cierto que el título de la finca "Playa," inmediatamente pasó a los demandantes al morir Busó, y esa propiedad, por tanto, no forma parte de la herencia para los fines de la partición, y no puede ser incluída en los procedimientos para la división y distribución de esa herencia. Pero el artículo 935 no dice que los bienes reservables revertirán a los que tengan derecho a ellos (*revertees*) libres de toda carga o gravamen equitativo o responsabilidad para el reembolso de los fondos pertenecientes a una sociedad de gananciales posterior que se han utilizado para convertir un bien mueble inútil e improductivo en una fuente de ingresos permanente y prolífica. Ni tampoco hallamos en ese artículo ni en ningún otro sitio una base satisfactoria para la imputación de tal intención a nuestra Legislatura Insular.

En el presente caso la propiedad en cuestión parece no haber valido más de $2,500 al tiempo del segundo matrimonio. No hay nada en absoluto que demuestre si fué o no tasada para los efectos de las contribuciones o si habiendo sido así tasada, produjo o no lo suficiente para pagar el montante de tales contribuciones, o si siquiera produjo algo por vía de renta. Al tiempo del juicio se estaban acumulando los cánones de arrendamiento a razón de $500 mensuales, bajo un contrato de arrendamiento que no había vencido. Es bastante curioso que ni el valor de la finca al tiempo de la disolución del segundo matrimonio, incluyendo el valor de las mejoras que se dice fueron efectuadas con los fondos de la sociedad de gananciales, o sea, en cuanto a lo que indica el canon mensual acumulado, según se manifiesta arriba, de acuerdo con un contrato de arrendamiento por cinco años, ni cuál hubiera sido el valor del terreno sin tales mejoras, fueran probados por la evidencia aducida en el juicio. Hay algún conflicto en la prueba en cuanto al número de palmas de coco existentes en la finca al tiempo del segundo matrimonio, y es algo escasa y poco satisfactoria la prueba en cuanto a la cantidad de dinero, tiempo y labor invertidos por el cónyuge supérstite

después de ese segundo matrimonio, en cuanto al límite y naturaleza de los drenajes en cuestión, y en cuanto a la extensión de terreno que en realidad fué sembrada de cocoteros. Sin embargo, el enorme aumento en valor es evidente y, en ausencia total de algo que demuestre que cualquier parte de ese aumento se debe al transcurso del tiempo o a cualquier aumento general en el valor de las tierras sembradas de cocoteros, el mismo debe ser atribuído al cultivo y desarrollo de la nueva extensión de terreno que está ahora en completo estado de producción, y que aún desde el punto de vista más favorable a los demandantes, aproximadamente duplicó el tamaño del palmar original. La existencia de ese palmar original ha quedado más o menos velada por la duda por la declaración no corroborada y poco persuasiva de un solo testigo de los demandantes, que es desacreditado indirectamente por la descripción contenida en una escritura de venta en la cual él fué parte, que fué puesto en una situación poco envidiable en el examen de repreguntas y contradicho de plano por varios testigos de los demandados. Dentro de las circunstancias y a falta de una conclusión de parte de la corte inferior, no nos es posible evitar la conclusión de que el aumento en valor de la finca ''La Playa'' se debe enteramente al tiempo, labor y dinero invertidos por Busó Cabrera después de la fecha de su segundo matrimonio en drenar la tierra y en sembrar allí cocoteros.

No nos concierne en esta ocasión la bien conocida regla que gobierna la materia sobre mejoras permanentes hechas por una persona en las tierras de otra, en ausencia de controversia alguna en cuanto a título o a elementos incidentales de buena fe—ni tampoco nos concierne el caso de un cónyuge supérstite que invierte sus fondos privativos en bienes reservables, bien antes o después de haber contraído segundas nupcias. Si en el presente caso, por ejemplo, Busó Cabrera hubiera invertido el producto de la venta de la finca ''Mabú'' en el desarrollo de la finca ''Playa,'' pero sin contribuir para ello con su tiempo y trabajo, entonces

la esposa y los hijos del segundo matrimonio no tendrían derecho al reembolso procedente de los cánones acumulados después de la muerte de Busó, o en alguna otra forma, y la posición de los demandantes sería inexpugnable. Pero en vista de la clara disposición del artículo 1319, no puede haber presunción legal alguna al efecto de que un cónyuge supérstite que efectúa mejoras sobre bienes reservables a expensas de los fondos pertenecientes a la sociedad de gananciales de un segundo matrimonio, lo haga con la intención de que en caso de su fallecimiento la esposa sobreviviente y los hijos del segundo matrimonio sean privados de todo derecho a ser reembolsados por aquellos interesados en la reserva (*reservees*) de las sumas así gastadas. Y de existir tal presunción *juris tantum,* entonces hubiera sido más que vencida en el presente caso por la manifestación inequívoca de un fin, intención o entendido de parte del testador, contenida en el testamento de Busó Cabrera. Las personas con derecho a la reserva (*reservees*) que no solamente perciben el costo de las mejoras permanentes multiplicado varias veces debido al aumento en valor y productividad del inmueble, al revertirse éste, sino que también participan con la esposa y los hijos del segundo matrimonio en la división y distribución del total de cualquier reembolso que pueda hacerse, no pueden ser oídos en equidad y justa conciencia al quejarse de que no son responsables de tal reembolso. Hasta el límite de los beneficios y ventajas reales así recibidos, ellos sustituyen al dueño fallecido de los bienes reservables, para todos los fines prácticos, como herederos forzosos que son con respecto a tales bienes y con exclusión de todas las demás personas.

El mero hecho de que los que tienen derecho a la reserva (*reservees*) no hayan sido instituídos únicos y universales herederos del dueño de tales bienes reservables que no sobrevive en un matrimonio posterior, con respecto al interés de tal dueño fallecido en el derecho al reembolso de los fondos pertenecientes a la sociedad de gananciales, no surte

efecto alguno contra la anterior conclusión. Desde luego que la Legislatura pudo haberlo dispuesto así. Por otra parte, pudo haber preferido excluir a las personas con derecho a los bienes reservables de toda participación en la división y distribución de la cantidad de tal reembolso. El dejar de hacer estas dos cosas pudo haber sido deliberado o inadvertido. El resultado, bien sea poco satisfactorio o poco deseable, bien debido a olvido o a un designio deliberado, es a lo sumo un mero accidente o incidente, como sea el caso, de la ley de sucesión y distribución, que no puede afectar la cuestión que estamos considerando. El requisito estatutorio con respecto al reembolso de los fondos pertenecientes a la sociedad de gananciales gastados en mejoras útiles efectuadas sobre bienes privativos de cualquiera de los cónyuges prevé y encuentra la razón principal de su existencia en el hecho de que al disolverse la sociedad conyugal las mejoras en cuestión redundan sola y exclusivamente en provecho y beneficio de tales bienes privativos. Estas mejoras se revierten con las tierras, pero la porción hereditaria de las personas con derecho a la reserva en el remanente del capital dejado por la persona obligada a reservar, no forma parte de tal reversión. Si la Legislatura hubiese creído propio excluir a las personas con derecho a la reserva de toda participación en la división y distribución del activo de la sociedad de gananciales del segundo matrimonio al fallecer la persona obligada a reservar, tal exclusión, por lo poco razonable e injusta que fuere, no podría ser considerada como en menoscabo del derecho estatutorio de reversión.

*Debe revocarse en parte la sentencia apelada, confirmarse en parte sin modificación, modificarse en parte,* dentro de las limitaciones impuestas por los datos que están ante nosotros y por la ausencia de súplica alguna de parte de los demandados para un remedio afirmativo, y *así modificada se confirma con respecto a la parte así modificada;* todo ello sin perjuicio de ulteriores procedimientos en la

corte inferior no inconsistentes con esta opinión, y sin especial condenación de costas.