132 So.2d 97 (1961)
Esther Becker SHAPIRO
v.
John W. BRYAN, Jr., et al.
No. 91.
Court of Appeal of Louisiana, Fourth Circuit.
June 30, 1961.
*98 Zelden & Zelden, Sam Monk Zelden, New Orleans, for plaintiff-appellant.
Thomas C. Wicker, Jr., New Orleans, for defendant Bryan, appellee.
John W. Bryan, Jr., New Orleans, in pro. per.
Sydney J. Parlongue, New Orleans, for defendants N. Shapiro, I. Shapiro and Birou, appellees.
Before McBRIDE, REGAN and SAMUEL.
REGAN, Judge.
Plaintiff, Esther Becker Shapiro, instituted this suit against the defendants, Nathan Shapiro, her husband, Isidore Shapiro, Arthur J. Birou and John W. Bryan, Jr.[1], endeavoring to annul a sale of real estate executed on September 12, 1958, to Bryan by his co-defendants, and to have it returned to the community, asserting that the sale was consummated in violation of an injunction, prohibiting her husband from alienating community property, which had been issued on July 30, 1957, the day she filed suit for separation from her husband; and further, that the defendants had fraudulently conspired to deprive her of her interest therein, and that defendant Bryan was not an innocent third party who purchased the property in good faith.
The defendants pleaded several exceptions which were disposed of and then answered, generally denying the allegations of the plaintiff's petition. Defendant Bryan, in effect, waived his exceptions[2], and then answered, emphatically denying that he possessed any knowledge of plaintiff's suit for a judicial separation and the injunction emanating therefrom prior to the act of sale and insists that he simply relied upon clear mortgage and conveyance certificates in acquiring title to the property as is customary in real estate transactions. He further asserted that the plaintiff's negligence, in not availing herself of the protection afforded by the laws of registry, was the only cause of this litigation.
Defendant Bryan instituted a third-party action against all of the other litigants, and requested the rendition of a judgment for $34,668.33, representing generally the costs which he had incurred in connection with the purchase of the property and the damages resulting therefrom, should the sale be rescinded.
From a judgment dismissing the plaintiff's suit and the third-party action, the plaintiff has prosecuted this appeal.
The record discloses that the plaintiff filed suit for separation from bed and board against the defendant, her husband, Nathan Shapiro, on July 30, 1957, and at that time a restraining order which was later converted into a preliminary injunction, was issued prohibiting the husband *99 from alienating any community property. Neither the pendency of the suit nor the prohibitory orders of the court were recorded in the mortgage or registered in the conveyance offices of the Parish of Orleans.
On September 12, 1958, defendant Bryan purchased the property[3] for a consideration of $23,000 and individually assumed the payment of the realtor's commission amounting to the sum of $1,150.
In the course of the trial, Nathan Shapiro testified that he did not meet Bryan until the day of the sale; that when interrogated by Edward P. Ecuyer, the notary who passed the act, if he were divorced, he answered negatively; that he was not questioned as to being separated or as to the pending separation suit; that he volunteered this information to no one; that although he had communicated with his wife in an endeavor to obtain her authority for him to sell this property, he also related this to no one. In the final analysis he explained that he was silent on such matters because "I didn't know I was not supposed to sell it."
Edward P. Ecuyer, the notary who passed the act of sale, related that when he prepares an act of sale, he leaves the marital status of the vendor and the vendee open until they appear in his office to execute the agreement. He then, as he did in this case, interrogated Nathan Shapiro who asserted that he was not judicially separated or divorced. The notary was obviously more cautious than usual, because he had heard rumored a day or two before the sale that Shapiro and his wife were not living together. As a result thereof, the following recitation appears in the act of sale: "* * * Nathan Shapiro has been married but once and then to Esther Becker, from whom he has never been judicially divorced or separated; * * *" Ecuyer explained that he customarily inserted the foregoing phraseology in the act when describing the marital status of a vendor living separate and apart from his spouse when no legal action had occurred in connection therewith.
Under cross-examination Ecuyer conceded, as we have related hereinabove, that he had heard a very short time before the act of sale was to be executed that the Shapiros were not living together, that he did not pursue this subject with Nathan Shapiro prior to passing the act[4], but that he had telephoned this information to Bryan a short time before the date of the sale. He was positive in asserting that he would have never consummated the sale if he had known of the pending suit for separation, and to emphasize the truthfulness thereof, he pointed out that his employer, the Guaranty Income Life and Insurance Company, had loaned Bryan $14,500 predicated on his opinion that the title to the property was good and merchantable.
Bryan acknowledged receiving the telephone call from Ecuyer, which he stated occurred the day before the passage of the act. He conceded that he made no further inquiries, and in explanation thereof related that an examination of the mortgage and conveyance records failed to disclose any recordation or registration of the pending suit for separation, and that Beryl Wolfson, the attorney who represented the vendors, had never given to him the slightest indication relative to the inability of any of the vendors to convey good title to the property; that it had been advertised for sale in the local newspapers, that the sale had been pending for several months, that there had been disagreements between the parties as to the proper description of the area of the property which ultimately resulted in a request for a diminution of the price thereof, and that this dispute was finally settled just before the execution of the sale.
*100 Bryan further related that he spoke to no one who was present in the notary's office on the day of the sale relative to the rumor of a separation since he thought it was a "friendly separation and I might say, apparently temporary." His opinion was based on knowledge that the Shapiros had been in New York together attending the wedding ceremony of their daughter and Wolfson had requested of Bryan an extension of time to pass the act of sale because of Nathan Shapiro's absence from the city on this occasion.
He concluded by stating that he first learned of the actual existence of the suit for separation the day before he was served with notice of this suit to annul the sale.
Beryl E. Wolfson, who as we have said, was the attorney representing the vendors at the act of sale, appeared on behalf of the plaintiff. He testified that he knew the plaintiff and her husband personally and knew that there had been an earlier suit for separation filed, but which had been withdrawn. He also knew that at one time a restraining order had been issued by the courts but when he examined the mortgage and conveyance records, he found none recorded or registered and called this to the attention of counsel for plaintiff[5] about nine to twelve months prior to this sale. He also conceded he knew of the pending separation suit and the possibility of another restraining order which in his opinion "would be effective if registered or recorded in the Conveyance Office, and I presume if it was intended to be effective it would have been recorded, sir, because, Mr. Zelden, I spoke with you at an earlier date, (in relation to the first suit filed for separation) and you had advised me that you all had not tied up Mr. Shapiro as you may have."
Wolfson stated that he did not counsel Nathan Shapiro in connection with his personal inability to convey the property since he had not been retained for this purpose. He did not inform Bryan of the suit, nor was there any discussion about the marital status of the Shapiros when the sale was passed. He corroborated the testimony of Bryan, particularly with respect to having secured an extension of time in which to pass the act of sale, due to Nathan Shapiro's absence from the city while attending his daughter's wedding in New York City.
No useful purpose would be served by indulging in a protracted discussion of the foregoing testimony. Suffice it to say that predicated thereon the trial court in its written reasons for judgment found, inter alia, that the defendant Bryan was not guilty of a conspiracy to defraud the plaintiff and that therefore Bryan purchased the property in good faith, that this litigation could have been avoided by the simple expedient of recording or registering notice of the separation suit and the injunction emanating therefrom; that Article 150[6] of the LSA-Civil Code upon which the plaintiff principally relies to annul the sale would apply to a third person if he or she acted in concert with the husband for the purpose of defrauding the wife.
Our examination of the record reveals that the foregoing factual conclusions of the trial judge are fully supported by the evidence inscribed therein and that the existing law and the jurisprudence interpretative thereof was correctly applied thereto.
On appeal, both in brief and in oral argument before this court, counsel for plaintiff asserts that the sale should be set aside, despite the fact that the plaintiff failed to record notice of the pending separation *101 suit and the injunction emanating therefrom. Counsel argues in support thereof that the law of public registry, as enunciated in the case of McDuffie v. Walker[7] does not apply in this instance since no judgment was obtained, and therefore, the rationale of Article 150 is exclusively applicable to the facts of this case.
Defendant Bryan conversely insists that he had a right to rely on the public records in purchasing the property. He, in effect, argues that the rationale of the lis pendens statutes prevails over the provisions of Article 150 in the absence of fraud on the part of the purchaser.
The issue then, reduced to simplicity, is this: Does the law of public registry afford protection to an innocent third party where community real property is sold to that party by one of the spouses while a separation suit is pending, if notice of that suit is unrecorded?
The statutes relied upon by the defendant are these:
LSA-C.C. Art. 2266: "All sales, contracts and judgments affecting immovable property, which shall not be so recorded, shall be utterly null and void, except between the parties thereto. The recording may be made at any time, but shall only affect third persons from the time of the recording.
"The recording shall have effect from the time when the act is deposited in the proper office, and indorsed by the proper officer."
and
LSA-R.S. 13:3541: "The pendency of an action in any court, state or federal, in the state affecting the title, or asserting a mortgage or lien upon immovable property, shall not be considered or construed as notice to third persons not parties to such suit, unless a notice of pendency of such action shall have been made, filed or registered, in compliance with R.S. 13:3541 through [R.S.] 13:3543."
To resolve the conflict it becomes initially necessary for us to analyze McDuffie v. Walker and the exceptions thereto which have been spawned by the jurisprudence. Briefly stated, the ratio decidendi of the McDuffie case was simply that a third-party purchaser was required only to look to the public records in ascertaining the validity of the title to real estate, and this rule applied even in situations where he had actual or constructive knowledge of a title defect that was not registered or recorded in the public records. The foregoing pronouncement of the public registry law by the organ of the court in that case has now become firmly established in our jurisprudence. Behind this settled doctrine stands the public policy of protecting the security of real estate transactions. The two exceptions thereto have occurred in the areas of the law relating to forced heirship and community property, but since we are solely concerned with the latter, it is only necessary in order to preserve the ratio decidendi of this case to discuss the exception relating to community property.
The Succession of James[8] provided the facts which created the first conflict between community property and public registry laws. The wife therein purchased property during the existence of the community in her maiden name and the act of sale recited that she was a feme sole. She thereafter mortgaged the property, and again the act recited that she was single. After her death, her creditors seized and sold the property to satisfy claims against her. The court limited the creditors' share to the wife's one-half interest, despite the fact that the public records were devoid of any notice to forewarn the creditors of her true marital status. In this opinion, written in 1920, the court reasoned that the only important issue to determine was whether, as a fact, the property had been acquired during the *102 existence of the community, thus, in effect, it gave priority to the community property laws.
Some thirty years after, the conflict between public registry and community property laws was again raised by the facts emanating from the case of Humphreys v. Royal.[9] The husband therein left his wife in Mississippi without obtaining a judicial separation or divorce and moved to Louisiana where in 1936 he purchased immovable property, representing that he was not married. In 1938 he sued his wife for divorce, which was secured through substituted service. The judgment of divorce was not recorded. In 1941 he sold the property, again reciting his marital status as single in the act of sale. Shortly thereafter, Humphreys, who knew of the husband's marriage and divorce, visited the wife in Mississippi to inform her of her ex-husband's acquisition of property in Louisiana and thereafter he succeeded in purchasing her half interest therein. He then filed suit against the third-party purchaser to be recognized as co-owner of an undivided one-half interest.
In that case, the court gave precedence to the public registry law and reasoned that the unrecorded judgment of divorce, insofar as it affected real estate, was a nullity as to third persons. In so deciding, the court distinguished the James decision by pointing out there was no judgment involved therein that could have been recorded and further, that Article 2266 of the LSA-Civil Code applied only to judgments.[10]
In view of this distinction, we believe that it is necessary to determine whether Article 150 applies to the case before us. To reiterate, this article states that a sale of community effects by the husband, after the filing of a suit for separation, shall be declared a nullity if the transfer was made to defraud the wife of her community interest. It is of interest to note that since its inclusion in the Louisiana Civil Code, there has been no Louisiana case interpreting it.
The legislation which we think we are forced to consider in connection with its effect upon Article 150 is the first lis pendens statutes, which were adopted in 1904. Among other things, the statutes provided that notice of suit, which would affect the title to real estate, had to be recorded to have any effect whatsoever on third parties. The notice of suit statutes, in effect when this litigation arose, were LSA-R.S. 13:3541-3543.
In view of what we have said hereinabove, we must now decide whether a wife who desires to avail herself of the remedy outlined in Article 150, must initially comply with the recordation requirements of the lis pendens statutes in order to affect third parties. The first notice of suit statutes were adopted thirty-four years after the 1870 Code, and the language thereof reflects no intent to create any exceptions to the recordation requirements. It is also pertinent to observe that prior to the 1904 legislation, the mere filing of a suit was construed as constructive notice to the world that the suit was pending; therefore, no recordation of notice was necessary. Obviously, when Article 150 was adopted, there was no requirement of registry contained therein since the law supplied the presumption of notice from the mere act of filing. Therefore the codal *103 article and the statute should be so construed as to preserve the intent and object of the legislation. The lis pendens statutes were enacted to relieve innocent third parties of an unfair burden of presumed knowledge and at the same time it afforded a practical protective device to the party whose rights were in jeopardy.
In the case before us, the wife's interest could have been adequately protected by recording the notice of suit and the ancillary injunction.
Returning briefly to the James and Humphreys cases, it will be recalled that there was no judgment in the former and the court protected the community interest in preference to the public registry policy, while in the latter, where there was a judgment and the wife theoretically had a means available to protect her community interest and failed to use it, the court applied Article 2266 and gave precedence to the public registry law.
In the case before us we have neither the factual situation of James nor of Humphreys. Unlike James, the spouse whose interest is in jeopardy had an opportunity to protect her interest in the instant case. Unlike Humphreys, there is no judgment which would allow the square application of Article 2266 to these facts.
But we think it not only reasonable but absolutely necessary to conclude, in order to preserve the sanctity and security of title to immovables, that the public registry law should prevail over the literal interpretation placed upon Article 150 by the plaintiff's counsel, and especially so, in instances where the injured spouse possessed adequate means of protecting her real property interest from the actions of her errant husband and failed to do so.
We say this fully cognizant of the existence of one or two hardship cases which undoubtedly posed vexatious problems, wherein the organ of the court expressed the opinion that the community interest was paramount to, and should prevail over the rules of recordation. However, it should be noted that in these cases the court reached that result by balancing the equities of the spouses. But as between the plaintiff and the innocent vendee herein, who had purchased the property in reliance on the public records, the equities obviously favor the vendee.
The issue here does not involve a choice by the court between supporting a fraud and diminishing its occurrence, but rather one drawn solely between the injured spouse and the innocent third party. It is not inequitable that the wife should be the one who must resort to a personal action against the errant husband especially where, as here, the record shows that he is financially able to respond thereto. As between an innocent vendee, who the record shows is a stranger with no knowledge of the vendor's character, and the wife, a firmly established policy protecting the third party appears equitably justified.
In view of what we have said hereinabove, we reach the inevitable result that the lis pendens statutes, insofar as they affect Article 150, would require the wife, as a condition precedent, to record notice of suit or orders emanating therefrom before availing herself of the remedy provided by that article.
It should also be emphasized, in the alternative, that even if the wife were not required to record a notice of suit before attempting to rescind the sale under Article 150, the record totally fails to support the allegations of fraud on the part of Bryan, which we think the plaintiff would be required to prove with that certainty required by law in order to annul the sale. We draw this conclusion from the rationale of the French commentators.
We observed hereinabove that we have found no case, nor have counsel referred us to any, interpreting Article 150, which was derived from Code Napoleon Article 271 and therefore we are relegated to the French commentators for an interpretation thereof. They all appear to agree that fraud on the part of the third party must be *104 proved in order to annul a sale encompassed by facts which appear in this case. This conclusion is emphasized by the following extract taken from the Cours de droit civil francaise by Aubry et Rau[11], which was considered the "chef d'oeuvre" of French juridical science of the last century:[12]
"However, obligations contracted by the husband against the community, and alienations made by him of objects belonging to it, posterior to the ordonnance of which Article 878, Code of Procedure, speaks, must be annulled when they have been contracted or made in fraud of the rights of the wife, and if the third parties with whom the husband has dealt have been accomplices of the fraud."[13]
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.
NOTES
[1] He is a practicing attorney in New Orleans, La.
[2] This was done in order that the case could be tried on its merits; the trial judge was likewise interested in removing all technical issues from the case since a member of the bar's integrity was questioned. We have written a more detailed factual opinion than would ordinarily be necessary, for the same reason.
[3] It is designated by the municipal number 2218 La Salle Street in the City of New Orleans.
[4] Except, of course, to ascertain that he was not judicially separated or divorced.
[5] Sam Monk Zelden.
[6] "From the day on which the action of separation shall be brought, it shall not be lawful for the husband to contract any debt on account of the community, nor to dispose of the immovables belonging to the same, and any alienation by him made after that time, shall be null, if it be proved that such alienation was made with the fraudulent view of injuring the rights of the wife."
[7] 1910, 125 La. 152, 51 So. 100.
[8] 1920, 147 La. 944, 86 So. 403.
[9] 1949, 215 La. 567, 41 So.2d 220.
[10] While it is true that there was no judgment that could have been recorded in the James case, there was evidence in the public records that the wife was single. If the rationale of McDuffie had been applied, actual knowledge of the wife's status would not have affected the seizing creditors who had dealt with the wife as a single woman and who could point to the public records in reliance upon her ability to contract as such. We think the court in the James case actually reasoned that the community interest of the husband took priority to the public registry laws and in the light of the language used therein, it is doubtful that a recorded judgment would have changed the result.
[11] 5 Aubry et Rau, Cours de droit civil francaise, 4th ed., 1872, sec. 494, p. 204.
[12] George Wilfred Stumberg, Guide to the Law and Legal Literature of France, Washington D. C., U. S. Government Printing Office, 1931, p. 81.
[13] "Toutefois, les obligations contractees par le mari a la charge de la communaute, les alienations par lui faites des objects qui en dependent, posterieurement a l'ordonnance dont il est parle en l'Article 878, du Code de Procedure, doivent etre annulees, lorsu'elles ont ete contractees ou faites en fraude des droits de la femme, et que les tiers avec lesquels le mari a traite out ete complices de la fraude."