Rosa García González, demandante y demandada recurrente, *v.* Apolinar Montero Saldaña, demandado y demandante recurrido.

Número: R-76-433        Resuelto: 15 de mayo de 1978

320

*Antonio Reyes Delgado, Francisco A. Delgado Morales y Alexis Martinó Curbelo,* abogados de la recurrente; *Carlos E. Colón Cordero,* abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

En contraste con otras empresas, comunidades o sociedades regulares—que tienen como razón de ser y propósito primordial el lucro—la sociedad legal de gananciales presenta características y perfiles singulares mediante los cuales el legislador regula y estructura jurídicamente la faceta económica del matrimonio. Como regla general hombre y mujer llegan al matrimonio motivados por una gama de factores psico-físicos y no por móviles estrictamente económicos; al fundir cuerpo y alma como compañeros de vida, los envuelve sentimientos altruistas y sublimados personales producto de un sincero amor, en el cual las consideraciones pecuniarias son secundarias. Salvo situaciones en que se otorgan capitulaciones matrimoniales, queda relegada a segundo plano, la realidad de que una vez formalizada la unión matrimonial, ha nacido una sociedad de matices jurídicos plenos que mantendrá vida hasta la disolución del vínculo. Para muchos, con los años, dicha unión florece y se afianza al extremo de que se mantiene incólume y erigida independientemente del rigor y magnitud de las variadas pruebas a que sea sometida. Para otros, el devenir del tiempo unido al desinterés, falta de comprensión y otras causas romperá la solidaridad anhelada, des-

truyendo la relación espiritual necesaria; el producto final será un divorcio.

■ Como consecuencia de los fenómenos que nutren la sociedad legal de gananciales, se explica la laxitud y desinterés con que los cónyuges regularmente llevan a cabo las transacciones rutinarias. No se llevan libros de contabilidad, ni la ley lo exige. La confianza de una esposa en la capacidad y buen juicio del marido—hasta hace poco único Administrador de tales bienes—contribuye al relajamiento.

Fracasado el matrimonio y defraudados mutuamente los cónyuges, frecuentemente sobrevienen y afloran recriminaciones del pasado, manifestándose en alto grado las diferencias en los desembolsos habidos, transacciones efectuadas y equidad en la división de bienes. Muchas veces las exigencias de los cónyuges se tornan en reclamos intransigentes. Para esta eventualidad, y para los casos de disolución por muerte o nulidad, previsoramente el Código Civil consigna normas que aunque a veces imperfectas, intentan dirimir los conflictos económicos durante y después del matrimonio entre marido y mujer, hijos, herederos y frente a terceros.

Con este breve trasfondo, veamos la sinopsis de hechos que dan génesis al recurso ante nos.

La recurrente Rosa García González y el recurrido Apolinar Montero Saldaña contrajeron matrimonio el 26 de febrero de 1955. A esta fecha, Montero poseía tres fincas en el Barrio Tetuán en la zona cafetalera de Utuado de 93.795, 33.33 y 17 cuerdas, las cuales sostenían algún ganado, unas casas viejas y una casa máquina para procesar café. Además poseía una tahona y una finca denominada Lake View en el Barrio Caonillas Abajo de 0.331 cuerdas y dos casas.

Con el transcurso de los años y en virtud del esfuerzo mutuo, estas fincas y otras fueron exitosamente explotadas mediante el cultivo y la recolecta de frutos menores, particularmente con café. Con el rendimiento de estas labores se edificaron varias estructuras para el uso familiar, escolar y

residencial de los obreros. Adquirieron otros bienes inmuebles y muebles. Económicamente el matrimonio prosperó. Para el año 1969 surgieron serias e irreconciliables discrepancias conyugales. La Sra. García dejó el hogar y se trasladó a vivir separada. En 31 de julio de 1970 Montero radicó demanda de divorcio (CS-70-1846) por abandono. La Sra. García reconvino por trato cruel y adulterio y se suscitaron numerosas contiendas e incidentes. El Tribunal Superior adoptó varias medidas para proteger los bienes gananciales, incluyendo la designación en 12 de octubre de 1971, de un Administrador Judicial y la publicación de un Edicto Informativo de la contienda y de que sin la autorización judicial no sería gravada la sociedad conyugal por ninguna deuda de sus miembros. El Administrador Judicial realizó un inventario de los bienes y oportunamente rindió un informe. Después fue relevado por diferencias con la recurrente. En 7 de abril de 1972 el tribunal dictó sentencia archivando el caso.

Así las cosas, a los pocos días, el 21 de abril, Montero vuelve a radicar otra acción alegando separación (CS-72-1099), la cual fue archivada el 7 de junio de 1972 por desistimiento. En 16 de noviembre la Sra. García inicia trámite de divorcio (CS-72-3155), también por separación, que fue archivado por sentencia el 6 de mayo de 1973. Finalmente, el 7 de diciembre ella radica acción por la misma causal (CS-73-1441), la cual culmina en sentencia de divorcio fechada 9 de mayo de 1973, final y firme el 8 de junio.

A manera de paréntesis, debemos consignar que la data expuesta demuestra, con apoyo en la evidencia, que desde el año 1970 los esposos Montero-García habían cesado toda vida matrimonial y que con el transcurso del tiempo se fueron agudizando las diferencias relativas a sus respectivos derechos en el orden económico y patrimonial.[1]

---

[1] En evidencia obra, además, los autos de la causa CS-72-1675 representativa de una acción de alimentos promovida por la Sra. García. Fue archivada por desistimiento.

Meses después del divorcio, los excónyuges radicaron pleitos separados dirigidos a la liquidación de la sociedad legal de gananciales. Fueron consolidados. La ventilación de los hechos fue encomendada a un Comisionado Especial ante quien se desfiló abundante prueba testifical y documental. El tribunal de instancia acogió la mayoría de las conclusiones de hecho del Informe y dictó sentencia reconociendo el carácter privativo de algunos bienes inmuebles, naturaleza ganancial de otros, deudas y créditos de la sociedad y sus miembros, y la eventual tasación de unas edificaciones y venta de las mismas. No conforme con algunos extremos, a solicitud de la recurrente García, expedimos auto de revisión.

# I

PRIMER ERROR:

"Al negarse a ordenar la transcripción de las grabaciones de los procedimientos, ya que el Señor Comisionado no cumplió con las prescripciones de la Regla 41.5 de las de Procedimiento Civil de 1958, lo cual ha dado lugar a que el Honorable Tribunal no haya emitido conclusiones de hechos en relación con:

(a) la cantidad de mejoras instaladas en la finca privativa del Recurrido vigente la Sociedad Conyugal de Gananciales, entre la Recurrente y el Recurrido, ni respecto a las inversiones hechas para producirlas.

(b) por falta de tal información el Tribunal Sentenciador haya negado el derecho de la Recurrente a la mitad de la suma de $23,296.70, pagados por el Departamento de Agricultura de Puerto Rico al recurrido por vías de subsidios.

(c) no reconocer el derecho de la Recurrente a la mitad del producido de las pólizas de aseguramiento de cosechas, y como resultado del Ciclón Eloísa, y,

(d) no reconocer a la Sociedad de Gananciales un crédito por el pago de una hipoteca por $5,000.00 a favor del Dr. Jacinto Quevedo García, [sic] constituida por el Recurrido antes del matrimonio con la Recurrente, y pagada constante éste."

■ El planteamiento general referente a la negativa de la sala sentenciadora a ordenar la transcripción de los procedimientos no tiene el alcance que se le atribuye. Lo expresado

en la Regla 41.5 (a) de las de Procedimiento Civil en el sentido de que el Comisionado ". . . acompañará una transcripción de los procedimientos . . . y de los exhibits originales . . .", constituye más bien una guía o directriz, que no obliga a los tribunales a conceder en todo caso y circunstancia la transcripción del proceso.

Superado este reparo, concentremos nuestra atención en los señalamientos específicos.

A. *Mejoras en la Finca Privativa del Recurrido Montero*

Se cuestiona la validez de la siguiente conclusión del tribunal a quo:

"Las plantaciones de cafeto y frutos menores que durante el matrimonio puedan haber sido sembradas en las fincas privativas del señor Montero Saldaña son privativas de él. La sociedad tiene derecho a que se le abone y pague lo invertido por ella para llevar a cabo dichos sembrados *(Busó vs. Carrasquillo, 37 D.P.R. 528; Manresa, Código Civil Español, Tomo 9, págs. 709 a 710, sexta edición; Artículo 287 del Código Civil, ed. 1930).* Ahora bien, se probó en este caso y se concluyó por el señor Comisionado qué plantaciones se sembraron y el costo de lo invertido en dichas siembras. *Entendemos que no. Tanto de la evidencia documental y testifical por nosotros examinada no surge tal prueba.* El peso de la prueba recae sobre el cónyuge que alegue la existencia de dichos sembrados, en este caso sobre Doña Rosa García González *(Santaella vs. Secretario de Hacienda,* 96 D.P.R. 442). Ahora bien, del conjunto de las pruebas y en especial del perito ofrecido por Doña Rosa García González, *podemos inferir y concluir que en realidad se llevaron a cabo siembras en las fincas privativas,* y en ausencia de pruebas específicas periciales sobre el particular y en búsqueda de hacer cumplida justicia en este caso, le damos un valor a dichas siembras, esto es, al costo para obtener las plantas y sembrarlas de $6,000.00, que Don Apolinar abonará y pagará a la sociedad." (Bastardillas nuestras.)

La exposición jurídica es correcta, pero en su aplicación fáctica erró el tribunal de origen. Obra en autos prueba fehaciente de carácter testifical y documental que nos permite concluir que durante el matrimonio se aumentaron las plan-

taciones y producción del café no sólo en las fincas privativas del recurrente—incluyendo la identificada como "Pedro Alberto Pérez"—sino en una ganancial de 12 cdas. A tal efecto el testimonio e informe del tasador Sr. Ramón Cruz Cruz designado por el Comisionado refleja que para el 28 de septiembre de 1974—diez y seis (16) meses después del divorcio—existían las siguientes plantaciones de café:

(FINCA "Pedro A. Pérez"—Privativa del Sr. Montero)

| Cuerdas | Años de Sembrada | Variedad | Quin- tales | Clasifica- ción |
|---|---|---|---|---|
| 4 | 3 | Bourbon | 12 | A |
| 7–8 | | PR y Bourbon | 40 | B |
| Remanente | | Bourbon | 5 | A |
| 2 | 1½ | | — | |
| — | | | 57 | |
| 14 | (no maduros para producción) | | | |

(FINCA 12 cuerdas—Ganancial)

| | | | | |
|---|---|---|---|---|
| 5 | 10–12 | PR y Bourbon | 25 | B |

(Restantes Fincas—Privativas del Sr. Montero)

| | | | | |
|---|---|---|---|---|
| 75 | 8–15 | | 225 | B |
| 11 | 10–12 | | 45 | B |
| — | | | — | |
| 86 | | | 270 | |

En su testimonio explicó y aclaró su informe, expresando que a su juicio ". . . [e]l 75% de la plantación es café viejo, de 15 a 20 años, *sin* incluir la finca de Pedro Alberto; el 25% de café restante es de café, 4, 5, 7 y 8 años." (E.N.P. 10.) Respecto a costos, la recurrente presentó el *Exhibit* 45 consistente de una Guía del Servicio de Extensión Agrícola que a la pág. 52 desglosa los gastos para desarrollar una (1) cuerda nueva de café hasta su producción comercial en cuatro (4) años. Resumida, esta data establece lo siguiente:

| PARTIDA | DISTRIBUCION POR AÑOS | | | | TOTAL |
|---------|------|------|------|------|-------|
| | *1ro.* | *2do.* | *3ro.* | *4to.* | |
| *Materiales=* | $136.00—$ | 41.50—$ | 60.50—$ | 58.00=$ | 296.00 |
| *Trabajo=* | $102.50—$ | 57.50—$ | 117.50—$ | 187.50=$ | 465.00 |
| *Otros* | | | | | |
| *Gastos* | $ 24.34—$ | 34.26—$ | 83.45—$ | 114.75=$ | 256.80 |
| | $262.84—$ | 133.26—$ | 261.45—$ | 360.25=$ | 1,017.80 |
| *Ingresos* | | | | | |
| (4 y 8qq) | | | $220.00—$ | 440.00=$ | 660.00 |

Total Gastos Acumulados:     $   357.80(²)

En atención a la prueba pericial y los elementos de juicio valorativos relativos a número o por ciento de cuerdas, años de sembradas y costos, podemos deducir razonablemente lo siguiente: a la fecha de la disolución matrimonial el recurrido Montero tenía 86 cuerdas de café sembrado en fincas privativas de las cuales 64.5 cuerdas (75%) habían sido sembradas antes de su matrimonio y el remanente de 35.5 cuerdas (25%) después del matrimonio; en términos pecuniarios ello representa que la sociedad ganancial aportó la cantidad neta de $12,701.90 (35.5 x $357.80). Las 14 cuerdas de la finca "Pedro A. Pérez" fueron sembradas totalmente durante el matrimonio, lo cual significa que la entidad conyugal desembolsó la suma de $5,009.20 en mejorarla. (14 x $357.80.) Ambas partidas totalizan $17,711.10 que representa la cuantía total de mejoras invertidas por la sociedad en bienes privativos del recurrido Montero que debe abonarle a aquélla. Procede aumentarse la suma de $6,000.00 adjudicada por el tribunal sentenciador a $17,711.10.

---

(²)Anotamos que el costo debe computarse a base de $357.80 por cuerda y no a razón de $1,017.80 como nos sugiere la recurrente ya que estaríamos cargando a la sociedad, como partida doble, las ganancias o frutos recibidos durante su vigencia. Huelga apuntar que el cómputo realizado es uno que toma bases aproximadas, pues el matrimonio—y la sociedad ganancial—perduraron durante 18 años.

B. *Reclamación sobre mitad de la Partida de $23,296.70 en concepto de subsidios del Departamento de Agricultura*

Numerosas horas nos ha tomado esclarecer y precisar el origen de esta partida. Sobre el particular es menester apuntar que ante el Comisionado y la sala sentenciadora se presentó prueba correspondiente a reembolsos de subsidios de jornales por la cantidad de $25,321.32 pagados al recurrido Montero a partir del mes de mayo de 1973. (*Exhibit* 11M.) Tanto en su memorando original como alegato final la recurrente aduce, reclama e identifica la suma de $23,296.70 como partida adicional recibida por Montero en igual concepto. Hemos leído y examinado detenidamente las determinaciones del Comisionado y el tribunal sobre este aspecto y estudiados los *exhibits* sobre los cuales se predica esta cantidad de $23,296.70 y resolvemos que efectivamente se trata de dos cantidades distintas, a saber: la de $25,321.32, procedente de subsidios agrícolas después del divorcio y la de $23,296.70 correspondientes a los *exhibits* 3, 27 y 28G; en igual concepto, recibidos y cobrados directamente por el recurrido([3]) entre el período de 12-1-69 al 12-22-71.

Aclarado este extremo, anotamos que el Comisionado en su Informe recomendó que la sala de instancia adoptase

---

([3]) El *exhibit* 11M corresponde fielmente a la partida de $25,321.32 de subsidios. Los *exhibits* 11G y 24G en que se apoya la cantidad de $23,296.70 no están en modo alguno relacionados con este concepto; el 11G es una escritura notarial de cancelación de hipoteca, y el 24G un recibo de certificado de acciones en el Federal Land Bank Assoc. of San Juan.

El error se origina en la siguiente interpretación de la recurrente: "Este planteamiento arranca de hechos probados. En el informe del Sr. Comisionado, a la página 13, éste consigna:

'11ma. Entre el mes de mayo de 1973 y 26 de abril de 1974, el litigante Sr. ¡Apolinar Montero Saldaña recibió de la Corporación de Crédito Agrícola en concepto de pago suplementario la cantidad de $25,321.32.'

Y a la página 15, apartado 'd', sobre cuestiones de derecho a concluirse, consigna:

'la Sra. García González tiene un crédito contra la sociedad de gananciales, por la mitad de $23,296.70, o sea, $11,648.35 (Conclusiones . . . 8va. y 9na.).' "

como conclusión de derecho que la recurrente era acreedora a que se le reconociese un crédito por la suma de $11,648.35 (deben ser $12,023.69) correspondiente a cheques expedidos al recurrido Montero antes de la disolución de la sociedad conyugal los cuales endosó y cobró para sí.

Ahora bien, subsiste el planteamiento en torno a la cuantía de $25,321.32. Examinémoslo.

El tribunal de instancia sobre el particular resolvió:

"18—Los dineros que Don Apolinar recibió y pueda continuar recibiendo de la Corporación de Crédito Agrícola por concepto de pagos suplementarios, no constituyen ganancias o haberes de la sociedad. Ello es así a tenor con la realidad de hechos que informan dichos pagos de acuerdo a las disposiciones de los Reglamentos de 21 de agosto de 1969 y de 30 de agosto de 1974, promulgados a tenor con la Ley #142 de 29 de junio de 1969. Dichos pagos constituyen incentivos para ser pagados a los obreros que utilizó Don Apolinar en las fechas antes mencionadas, pagos que se hacen por sobre el salario mínimo congelado. No siendo ganancias, rentas, frutos o pensiones, no constituyen haberes algunos que hubieren enriquecido el caudal común por razón de la sentencia de divorcio que se dictó el día 9 de mayo de 1973, sentencia que lo extinguió (*Vega* v. *Tossas,* 70 D.P.R. 392) . . . ."

En estricta lógica, este pronunciamiento jurídico es erróneo ya que no considera que el propósito medular de estos dineros es reembolsar al patrono aquellas cantidades de dinero pagadas a sus obreros en exceso del ingreso por hora garantizado a dichos trabajadores. Simplemente constituye una devolución de dinero ganancial previamente desembolsado por el agricultor.

Son bienes gananciales "los obtenidos por la industria, sueldo o trabajo de los cónyuges o de cualquiera de ellos." Art. 1301 (31 L.P.R.A. sec. 3641 (2) ). Según Borrell y Soler, con las "locuciones *industria, sueldo* y *trabajo* se comprende . . . todas las formas de retribuir la actividad productora del hombre, y todo ello quiere que se aporte al caudal común de los gananciales, ya se trate de trabajo manual o intelectual en

todas sus manifestaciones de utilidad económica." *Derecho Civil Español*, tomo IV, pág. 427; VI Puig Peña, *Compendio de Derecho Civil*, 192–193 (1965); Reyes Monterreal, *El Régimen Legal de Gananciales*, 161 (1962). De igual carácter es lo adquirido "a costa del caudal común". Tomo 4, Vol. I, Puig Brutau, *Fundamentos de Derecho Civil*, 653 (1967). Aun bajo el supuesto de que en la lata expresión de industria, sueldo y trabajo mencionada no estuvieran comprendidos directa o indirectamente los reembolsos por pagos suplementarios, éstos caerían en la órbita ganancial de determinarse que el crédito tuvo génesis durante la vigencia matrimonial.

Ahora bien, toda revisión se da contra la sentencia y no sus fundamentos. Según el análisis de la prueba, en particular el legajo de la Corporación de Crédito Agrícola, surge que todos estos reembolsos corresponden a pagos salariales posteriores al decreto de divorcio. No procede por lo tanto el crédito solicitado por la recurrente García.

C. *Reclamación de la mitad del producido de las pólizas de cosechas e indemnización de pérdidas resultantes del ciclón Eloísa*

Bajo este acápite se cuestiona la negativa de la sala sentenciadora en adjudicar a la recurrente la mitad de las indemnizaciones pagadas en virtud de unas pólizas sobre las cosechas aseguradas y por los daños compensados como resultado del ciclón Eloísa que azotó a la isla en septiembre de 1975.

El planteamiento es improcedente por las siguientes razones: (1) la propia recurrente admite que ". . . nunca se ha presentado ante el Hon. Tribunal sentenciador prueba de la cual se pueda determinar en cuales fincas se sembraron las plantaciones averiadas." (Alegato, pág. 24.) Siendo ello así carecemos de información precisa o básica sobre la cual podamos adjudicar la cuantía reclamada; intentarlo sería una aventura riesgosa y especulativa. Máxime, como afirma Puig Brutau, cuando "[d]isuelta la sociedad, sus titulares son

partícipes en una comunidad ordinaria. Aunque el estado de indivisión se prolongue, se tratará en todo caso de una masa en liquidación. Esta nueva comunidad ya no se halla regida por las normas de la sociedad de gananciales que hasta entonces se aplicaban a los bienes de los cónyuges. Así, los frutos de los bienes privativos ya no pasan a ser bienes comunes (sin perjuicio del reparto proporcional de los frutos pendientes)." *Op. cit.*, pág. 784; (2) se intenta cobrar una indemnización por cosechas destruidas dos años después de disuelto el vínculo matrimonial; y (3) ello sería incompatible con nuestra decisión reconociendo a la sociedad ganancial un crédito por las mejoras introducidas en las fincas privativas del recurrido.

D. *Pago de Hipoteca de $5,000.00 al Dr. Jacinto García Quevedo*

Es un hecho no contradicho que en 22 de junio de 1954 el recurrido Montero obtuvo un préstamo del Dr. Jacinto García por la suma de $5,000.00, el cual garantizó mediante hipoteca sobre una finca privativa llamada *Lake View* ubicada en el Barrio Caonillas, Utuado, según lo establece la Escritura Pública Núm. 37 suscrita ante el extinto notario Gustavo Zeno Zama. Al evaluar dicho documento advertimos que la finca fue tasada para fines de una eventual ejecución en la suma total de $8,000.00 y que Montero se obligó a mantener un seguro contra incendio y huracán sobre las casas que enclavaban en dicho inmueble, a favor del acreedor Dr. García Quevedo por la suma de $6,000.00.

Si bien la transacción se efectuó en estado de soltería, la obligación vencía en o antes de los tres años de su otorgamiento, esto es, en un período en que ya estaban vigentes las nupcias con la recurrente García. Ni en la demanda, vistas ante el Comisionado como tampoco ante la sala de instancia, ella alegó ni produjo prueba de que el saldo fuera hecho con dinero proveniente del caudal común. Es en la revisión ante nos, que por primera vez se intenta sostener la cuestión bajo

la tesis de que dicho hecho se debe inferir ante el silencio del recurrido y estimarse probado en virtud de la ". . . presunción de ley que los contratos se cumplen según convenido." Esta circunstancia basta para desestimar el planteamiento.

## II

SEGUNDO ERROR:

"Al resolver, en contrario a lo que demuestra la prueba y estipularon las partes en la conferencia antejuicio, que la finca llamada 'Pedro Alberto Pérez' es un bien privativo del recurrido y no de la sociedad de gananciales."

Para sostener este señalamiento, la recurrente García parte de la premisa de que en la conferencia con antelación a juicio celebrada el 28 de marzo de 1974, el abogado del recurrido Montero aceptó el carácter ganancial de dicho inmueble y posteriormente así también lo determinó el Comisionado Especial. (T.E. pág. 96.)

Hemos leído totalmente la transcripción de dicha vista y apreciamos que la misma constituye un diálogo extenso, a veces confuso, de los abogados de las partes ante el tribunal, estando éstas presentes, sobre sus variadas versiones y contenciones en torno a los montos y carácter de diversas deudas, bienes inmuebles y muebles, y teorías jurídicas aplicables. Hubo esfuerzo y se intentaron acuerdos, algunos exitosos y otros no. Sin embargo, la validez de las estipulaciones acordadas se condicionó a que la estenotipista transcribiera y remitiera su contenido a los abogados, quienes subsiguientemente se reunirían para un análisis final determinante sobre lo acordado y en controversia; introducir las enmiendas que creyeran de lugar; convendrían respecto a las conclusiones de hecho; las reducirían a escrito y someterían al tribunal para que éste resolviera los aspectos de derecho. (T.E. págs. 49 y 50.) Este trámite ulterior lamentablemente nunca se culminó. Oportunamente la ilustrada sala sentenciadora consignó su criterio correcto de que la alegada estipulación nunca tuvo sus auspicios y no le impartió su aprobación. Al exami-

nar la teoría del recurrido en dicha vista—en el sentido de que las tres fincas que componen este inmueble denominado "Pedro Alberto Pérez" eran privativas—al igual que su objeción ante el tribunal de la conclusión en contrario del Comisionado, nos inclinamos a compartir el fallo del tribunal de origen en el sentido de que no medió tal estipulación. Apoya esta decisión, los términos de la séptima determinación del Comisionado en torno a que el sustancial pronto pago de $10,000.00 utilizado para la adquisición de dicho inmueble los ". . . aportó el litigante Sr. Apolinar Montero Saldaña de la venta del inmueble conocido como 'Lake View' que poseía desde el 1947", esto es, antes del matrimonio.

Abona a lo anterior, las constancias claras de que en la escritura de adquisición sólo compareció y específicamente la venta fue a favor del recurrido Montero Saldaña quien únicamente suscribió la transacción y asumió el pago de una hipoteca por $1,636.00 quedando a deber la suma adicional de $4,364.00 más intereses pagaderos en o antes del 30 de junio de 1969. Tampoco ayuda a la recurrente el que en tres segregaciones y enajenaciones ulteriores se manifestara—vigente el matrimonio—que la finca pertenecía a ambos y comparecieran ante el notario autorizante. Tales actos eran para ser evaluados con la totalidad de la prueba, y sus alcances quedaron definidos al aceptarse que la procedencia del dinero era incontrovertiblemente de origen particular. La encomienda del Comisionado estaba limitada a dirimir las cuestiones de hecho; su caracterización de que el inmueble era ganancial basada en una supuesta estipulación, trascendió su mandato. (⁴)

_____

(⁴) El abogado de la recurrente así lo reconoció en su moción radicada en instancia, fechada 30 de diciembre de 1975 y titulada *Objeción y Rechazo a "Oferta de Sentencia" de Montero Saldaña y otras consideraciones,* en que consigna: "Respecto a este particular solo señalamos que no es necesario que impugnemos tales conclusiones, de haberlas, porque obviamente las mismas no podía hacerlas el Sr. Comisionado." (Pág. 2.)

Nuestra doctrina jurisprudencial reiteradamente informa que la presunción de gananciabilidad contenida en el Art. 1307 del Código Civil (31 L.P.R.A. sec. 3647) en el sentido de que "[se] reputan gananciales todos los bienes del matrimonio, mientras no se pruebe que pertenecen privativamente al marido o a la mujer" constituye la piedra angular en toda causa litigiosa en que se intente precisar la naturaleza privativa o ganancial de los bienes del matrimonio. *Santiago v. Tribl. de Contribuciones*, 69 D.P.R. 305, 309 (1948). En *Espéndez v. Vda. de Espéndez*, 85 D.P.R. 437 (1962) indicamos, citando el criterio mayoritario de los tratadistas españoles, que la presunción tiene como propósito viabilizar que se diriman fácilmente las dudas que se suscitan sobre la procedencia de los bienes, y prevenir que se encubran donaciones prohibidas entre los cónyuges o actuaciones fraudulentas perjudiciales a terceros. El peso de la prueba recae sobre quien sustenta la naturaleza privativa. Cabe señalar que el rigor y exigencia de la prueba, a los fines de satisfacer la conciencia del juzgador, es menor cuando se trata de una reclamación entre los cónyuges o entre los herederos de uno y el supérstite a cuando se litigan derechos frente de terceros.

De igual modo el régimen de gananciales prevaleciente reconoce, como axioma básico, el patrimonio individual de cada cónyuge separado del de la sociedad. El título de origen será lo determinante, independientemente de los cambios o modificaciones que tales bienes experimenten. *Sucn. Santaella v. Srio. de Hacienda*, 96 D.P.R. 442, 446 (1968). Frente a reclamaciones recíprocas de los cónyuges, la procedencia privativa de un inmueble no pierde tal carácter por el hecho de invertirse posteriormente fondos pertenecientes a la sociedad de gananciales. Por analogía, véanse: *Vélez Cordero v. Medina*, 99 D.P.R. 113, 117 (1970) y *Lanausse v. Silva, etc.*, 84 D.P.R. 546 (1962). El principio establecido en el Art. 1307 del Código Civil respecto a que se reputarán ga-

nanciales todos los bienes adquiridos durante matrimonio preceptúa una regla de carácter evidenciario, a saber, una presunción controvertible. *Robles Ostolaza* v. *U.P.R.*, 96 D.P.R. 583, 589 (1968). Y finalmente, como dijimos en *Santiago* v. *Tribl. de Contribuciones*, 69 D.P.R. 305, 309 (1948), en "... el presente caso, sin embargo, no procede recurrir a esa presunción, sencillamente porque como dice la máxima legal, la presunción siempre cede a la verdad, esto es, a la prueba."

Recapitulando, habiéndose cuestionado la supuesta estipulación; resultando ésta contraria a la teoría de la parte; el exceso de la encomienda del Comisionado; y siendo meridianamente clara la prueba sobre el origen privativo del dinero con la cual se adquirió, resolvemos que el error no fue cometido.

## III

TERCER ERROR:

"Al confirmar las conclusiones del Sr. Comisionado al efecto de que la sociedad de gananciales habida entre el recurrido y la recurrente era deudora de $15,333.75 a Francisco Vélez, Inc., de $15,000.00 al Banco de Ponce, de $840.00 a Emilio Seda, Inc., y de $6,000.00 por la sentencia dictada por el Hon. Tribunal de Distrito de Arecibo en el caso de *Salvador Rivera Santiago vs. Apolinar Montero Saldaña y otro*, Civil CD-71-1760, sobre daños y perjuicios."

En este tercer señalamiento se impugna el haberse impuesto a la sociedad el pago de varias partidas que a juicio de la recurrente no procedían. Analizaremos separadamente las mismas.

A. *Deuda de Francisco Vélez, Inc.*

La solución de este apuntamiento exige un breve examen del Art. 101 del Código Civil. (5) Reza así:

_____

(5) Su procedencia es el Art. 150 del Código Civil de Luisiana que se remonta al 271 del Código Napoleónico. Su texto es distinto y varía al nuestro, pues la prohibición recae sobre el marido exclusivamente. A su amparo las cortes de dicho estado han resuelto que la prohibición sobre deudas contraídas por el marido no hace las mismas nulas, estimándose

"Desde el día en que el procedimiento de divorcio se inicie judicialmente, no será válida ninguna deuda contraída por el marido o por la mujer sin la autorización del tribunal, a cargo de los bienes gananciales." (31 L.P.R.A. sec. 344.)

En *Pasalacqua* v. *Ramos*, 34 D.P.R. 214, 215 (1925), indicamos que su texto significa que las deudas de ninguno de los esposos constituirá ". . . una carga a los bienes gananciales sin la autorización de la corte"; y en su contexto fáctico allí resolvimos que la desestimación posterior del pleito de divorcio no convalidaba una deuda asumida por el marido durante el trámite judicial. Y en *Alameda* v. *Registrador*, 76 D.P.R. 230, 239 (1954)—ratificado en *Suárez Martínez* v. *Tribunal Superior*, 85 D.P.R. 544 (1962)—dijimos lo siguiente en cuanto a los efectos respecto a los acreedores: "Hasta el preciso día en que el procedimiento de divorcio se inicie judicialmente, la separación de bienes que produce el divorcio, no perjudicará a los derechos adquiridos con anterioridad por los acreedores, según el artículo 1331 del Código Civil de Puerto Rico. Por lo tanto, desde la fecha en que se celebre el matrimonio hasta la fecha en que se inicie judicialmente el procedimiento de divorcio, o sea, hasta la radicación de la demanda de divorcio, cualquiera deuda contraída por el marido, o por la mujer en los casos apropiados, afecta directamente todos los bienes de la sociedad de gananciales, independientemente de la separación de bienes, que entre los cónyuges divorciados, produce el divorcio."

Al confrontar el derecho reseñado con la decisión del Comisionado y tribunal estimando vigentes e imputables a la sociedad ganancial la suma de $15,333.75 a favor de la firma

válidas pero exclusivamente sobre éste. En cuanto a la enajenación de bienes inmuebles de la sociedad, su nulidad requiere prueba de fraude intencional para perjudicar a la mujer. Para que haya nulidad de un tercero adquirente la mujer tiene que haber notificado mediante *lis pendens*. Véanse *Shapiro* v. *Bryan*, 132 So.2d 97 (La. App. 4th Cir. 1961) ; *Humphreys* v. *Royal*, 41 So.2d 220 (1949) ; y las siguientes notas: 49, No. 1 Tulane L. Rev., *Judicial Dissolution of the Marital Community in Louisiana*, 168, 180–181 (1974) ; XXV La. L. Rev., Comments, *Restrictions During Pendency of Separation and Divorce Suits*, 520–521 (1964).

comercial Francisco Vélez, Inc., fallamos que se incurrió en error. Hemos examinado meticulosamente la prueba documental([6]) en que se funda la misma y del *exhibit* 19 del recurrido, consistente de un estado de cuenta, se desprende diáfanamente que el 18 de agosto de 1970 éste adeudaba a Vélez, Inc., la cantidad de $4,282.32. Si bien esta fecha es posterior, resulta ser la más cercana al 31 de julio de 1970 en que se presentó la primera demanda de divorcio. Es razonable deducir que representa el valor de artículos adquiridos por Montero, imputables a la sociedad, ([7]) antes de iniciar su primera acción. Del mismo documento también surge que al 15 de octubre de 1971—cuando todavía estaba pendiente dicha acción—se adeudaban $15,333.75 que es la partida reconocida por el tribunal. En esta situación, no opera presunción de ganancialidad. Tampoco él demostró que tales gastos fueron en concepto de mercancías necesarias en provecho o utilidad de la sociedad de gananciales. ([8]) En consecuencia es de aplicación el principio recogido en el transcrito artículo y por lo tanto ineludible concluir que la entidad ganancial Montero-García sólo responde válidamente de la cifra de $4,282.32 y no de $15,333.75.

---

([6]) *Exhibits* M-14, 19 y 20; G-5 y G-6 (E.N.P. 6-8).

([7]) El *Exhibit* 6-G—original de una nota de cobro de Vélez, Inc., al recurrido Montero en 19 de julio de 1971—consigna que al 28 de octubre de 1970 el balance de su "Cuenta inactiva" era de $6,996.14 y al 14 de julio de 1971, "su cuenta nueva" arrojaba un balance de $8,502.66. En manuscrito expresaba:

"Estimado Polito:

"Te agradeceré me hagas efectivo el balance de tus cuentas como tú sabes yo te abrí otra cuenta en consideración del problema que tú tenías con el divorcio, pero yo necesito el dinero, que es bastante para mis compromisos.

"Gracias. (fdo) Luis Francisco Vélez."

([8]) Un examen de los autos originales del caso de divorcio 70-1846 corrobora que el Tribunal Superior, Sala de Ponce, que entendía en dicha causa no autorizó se contrajera y cargara al caudal nupcial esta deuda. Se emitió un edicto, del cual fue notificado la acreedora Francisco Vélez, Inc.

### B. *Deuda de $15,000.00 al Banco de Ponce*

El Comisionado y el tribunal concluyeron que la sociedad de gananciales adeudaba la cantidad de $15,000.00 al Banco de Ponce que fue satisfecha íntegramente por la recurrente Sra. García con dinero de su propio peculio, reconociéndosele a su favor un crédito contra la sociedad conyugal.

Ante nos ella cuestiona esta determinación alegando que $12,500.00 fueron préstamos tomados por el recurrido Montero después de incoarse la primera demanda de divorcio, que no pueden cargarse al patrimonio ganancial. Apoya esta contención en la siguiente certificación (*Exh.* 12 recurrido) expedida por el Banco:

"A QUIEN PUEDA INTERESAR:

Al señor Apolinar Montero Saldaña se le concedieron varios préstamos en este Banco. La relación es la siguiente:

| [1] | [2] | [3] | [4] |
|---|---|---|---|
| *Fecha* | *Préstamo* | *Abono* | *Balance* |
| 2–24–69 | $ 5,000.00 | —0— | $ 5,000.00 |
| 2–03–70 | —0— | $ 5,000.00 | —0— |
| 2–03–70 | 5,000.00 | —0— | 5,000.00 |
| 1–04–71 | —0— | 5,000.00 | —0— |
| 4–02–70 | 12,500.00 | —0— | 12,500.00 |
| 6–29–70 | 2,500.00 | —0— | 15,000.00[*] |
| | [25,000.00] | [10,000.00] | [15,000.00] |
| 10–1–70 | 8,500.00 | —0— | 23,500.00 |
| 11–9–70 | 4,000.00 | —0— | 27,500.00 |
| 1–14–71 | —0— | 4,000.00 | 23,500.00 |
| 1–14–71 | —0— | 8,500.00 | 15,000.00 |
| 2–12–73 | —0— | 15,000.00 | —0—" |

No le asiste la razón. De la relación bancaria se desprende —como hecho no contradicho—que *antes* de la presentación de la primera demanda de divorcio, la sociedad adeudaba la cantidad total de $15,000.00, la cual hemos identificado en la columna [4] con un asterisco.

Los $12,500.00 de préstamos tomados por el recurrido Montero los días 1 de octubre y 9 de noviembre de 1970, ya

radicada dicha acción, fueron satisfechos por éste el 14 de enero de 1971 cuando todavía prevalecía el proceso. Por ende subsistía la deuda de $15,000.00 de carácter ganancial al 6-29-70. El argumento de la recurrente se elabora sobre una premisa incorrecta al tomar como punto de partida la cifra de $37,500.00 a la cual llega sumando las cuatro (4) primeras cantidades consignadas en la columna [4] sin restar los abonos correspondientes. El que se intercalara en la certificación el abono de $5,000.00 efectuado el 1-04-71 entre las fechas 2-03-70 y 4-02-70 no destruye la exactitud del cómputo.

C. *Deuda de Emilio Seda, Inc.*

Se cuestiona la cantidad de $840.00. A tal efecto, la teoría de la recurrente es que ". . . no existe prueba en el récord que establezca ese hecho." Tiene razón. La Exposición Narrativa refleja que el único testigo para sostener esta partida fue el Sr. José Antonio Echevarría, quien como administrador de la corporación aclaró que desde el año 1969 ". . . no había tenido negocios con él [Sr. Montero], y que desde entonces nada le debía; que le proveyó materiales de construcción, pero se los había pagado." Más que insuficiencia de prueba, la desfilada contundentemente demuestra la inexistencia de la deuda, tal como lo reconoció su abogado al manifestar ante el Comisionado que se había cometido un error (E.N.P. 14).

D. *Demanda y Sentencia en Cobro de Daños y Perjuicios contra el recurrido*

Se objeta la cuantía de $6,000.00 por sentencia recaída en el caso de *Salvador Rivera Santiago, demandante vs. Apolinar Montero Saldaña y Juan Pérez Vargas, demandados, Civil Núm. 71–1760*, sobre Daños y Perjuicios, radicado en 12 de julio de 1971, ante el Tribunal Superior de Arecibo.

Una breve síntesis de las constancias que surgen de dicho caso resulta imprescindible. Salvador Rivera Santiago demandó judicialmente al recurrido Montero por la suma de $20,980.00 por concepto de daños ocasionados por el funciona-

miento negligente del *vehículo Ford Pick-Up*, tablilla 87-704 propiedad de éste por hechos ocurridos el 22 de noviembre de 1970, en la carretera del barrio Tetuán, de Utuado, P.R., a las 7:00 P.M., en ocasión de haber el codemandado, Juan Pérez Vargas, empleado del recurrido, impactado el caballo que montaba Rivera Santiago.

Como abogado del Sr. Montero compareció el Lcdo. Carlos R. Ruiz, quien aceptó las alegaciones relacionadas con la capacidad de las partes, la propiedad del recurrido sobre el vehículo, y que Juan Pérez Vargas era su empleado. Se ventiló el caso y se dictó sentencia contra el *recurrido* condenándole al pago de $6,000.00, costas y $600.00 de honorarios de abogado. Los procedimientos de ejecución de la sentencia se dirigieron contra una propiedad de la sociedad de gananciales y el abogado del demandante pidió se enmendara la orden de embargo para que esta se dirigiera contra la participación del recurrido en las fincas embargadas, solicitud a la cual sin objeción del Sr. Montero accedió el tribunal, embargándose en su consecuencia únicamente la participación del recurrido en las fincas señaladas.

En las circunstancias antes apuntadas el haberse cargado esta deuda a la sociedad ganancial constituyó un error. Primeramente, en dicho caso la sociedad legal de gananciales nunca fue hecha parte de los procedimientos; en segundo lugar, cuando ocurrió el accidente ya se había radicado la primera demanda de divorcio; (⁹) y en tercer lugar, no se demostró que la gestión que desempeñaba el conductor empleado de Montero fuera una para beneficio, directo o indirecto, de la sociedad conyugal. Como dijimos en *Lugo Mon-*

---

(⁹) A la anterior conclusión abona el espíritu y principio consagrado en el Art. 101 del Código Civil (31 L.P.R.A. sec. 344) antes mencionado, de que una vez iniciado el procedimiento de divorcio no serán válidos ni a cargo de la sociedad ninguna deuda contraída por cualesquiera de los cónyuges sin la autorización del tribunal. ¿Cómo sostenerse la responsabilidad de una sociedad por acción torticera de uno de los cónyuges cuando éstos se están divorciando?

*talvo* v. *González Mañón,* 104 D.P.R. 372–378 (1975), ". . . en casos de responsabilidad civil extracontractual, la responsabilidad será personal o de la sociedad de gananciales según los hechos que la produjeron. Generalmente se reconoce *que si la acción o gestión del marido aprovecha* económicamente la masa ganancial, la responsabilidad también será a cargo de dichos bienes." (Bastardillas nuestras.)

■ Finalmente, la doctrina invocada por el tribunal de origen para sostener la partida expuesta en *Vargas Vargas* v. *Belthor Cáceres Corp.,* 90 D.P.R. 37 (1964), no es de aplicación al caso de autos. Asumiendo que el vehículo en cuestión fuera ganancial, subsistirán las lagunas circunstanciales anteriormente apuntadas. La responsabilidad impuesta en virtud de la Sec. 13-101 de la Ley de Vehículos y Tránsito— Núm. 141 de 20 de julio de 1960, según enmendada—es con referencia a terceras personas perjudicadas, y no puede ser norma para determinar las obligaciones entre sí por reclamaciones de unos excónyuges en el proceso de división y liquidación de la sociedad de gananciales.

## IV

El cuarto error no se elabora adecuadamente, sino que constituye más bien una queja general que se nutre de los señalamientos específicos analizados. No amerita ulterior exposición de nuestra parte. ([10])

*Se dictará sentencia modificando la del Tribunal Superior, Sala de Utuado, en los siguientes extremos: (a) reconociéndose a la Sociedad Ganancial la suma de $17,711.10 en concepto de mejoras introducidas en fincas privativas del Sr. Montero, la cual deberá abonar y pagar a dicha entidad; (b) a la recurrente García la suma de $12,023.69; (c) re-*

---

([10]) "La sentencia recurrida es contraria a derecho y a las pruebas recibidas en el juicio, y sus resultados adversos a la Recurrente constituyen [*sic*] una manifiesta injusticia que se consumará en tanto esta Hon. Superioridad no intervenga . . . ."

*duciéndose a $4,282.32 la deuda ganancial de la sociedad con Francisco Vélez, Inc.; (d) eliminándose las cantidades de $840.00 y $6,000 respectivas por no corresponder a deudas gananciales.*

El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Torres Rigual no intervinieron. El Juez Asociado Señor Irizarry Yunqué se inhibió.